# Podolinski v. Episcopal Diocese of Pittsburgh

C.P. of Armstrong County, nos. 1994-0277-Civil and 1994-0831-Civil.

*Edward J. Feinstein,* for plaintiffs.

*Eric N. Anderson,* for defendants St. Paul's Episcopal Church of Kittanning and Jane Butler Englert.

*William Pietragallo II* and *Pamela G. Cochenour* for defendants Episcopal Diocese of Pittsburgh and Alden M. Hathaway.

*Arthur J. Leonard,* for defendant G. Lyman Reed.

VALASEK, *J.,* March 22, 1995—Before the court for disposition are preliminary objections filed on behalf of defendants.

## PROCEDURAL HISTORY

On April 5, 1994, plaintiffs, Peggy Podolinski and Lanny Podolinski, wife and husband, filed a complaint against defendants, The Episcopal Diocese of Pittsburgh, Alden M. Hathaway, St. Paul's Episcopal Church of Kittanning, and Jane Butler Englert. On June 23, 1994, plaintiffs filed a separate complaint against defendant, G. Lyman Reed.

On April 25, 1994, the Diocese and Bishop Hathaway filed their preliminary objections and supporting brief. On June 20, 1994, St. Paul's and Englert filed their separate preliminary objections and supporting brief.

On October 5, 1994, defendant Reed filed his preliminary objections and supporting brief.

The two lawsuits have not been consolidated by the court. The court will, however, issue one opinion addressing the preliminary objections of the various defendants, as the two lawsuits are based on a common factual situation.

## ALLEGATIONS OF COMPLAINTS

Plaintiffs allege that Father Reed, the rector of St. Paul's, acted tortiously during certain counseling sessions that took place between November 1991 and May 1992. Plaintiffs further allege that the other four defendants, the Diocese, Bishop Hathaway, St. Paul's, and Englert acted negligently in hiring, supervising, and training Reed and were also guilty of tortious conduct in handling plaintiffs' initial complaint against Reed.

Plaintiffs' complaints specifically allege the following:

Reed was the rector of St. Paul's at all times relevant to the complaints. As rector, he acted as the spiritual head of St. Paul's and served as a pastoral counselor in an office provided him at St. Paul's. Reed was selected by the vestry of St. Paul's to serve as rector.

The Diocese is a diocese of the Episcopal Church of America. Hathaway is the Bishop of the Diocese. Bishop Hathaway approved Reed's appointment as rector at St. Paul's.

St. Paul's is a church within the Diocese. St. Paul's is governed by the Diocese, its Vestry and Executive Committee, and Bishop.

Englert is the Senior Warden of the Vestry of St. Paul's. The Vestry, the members of which are duly

elected by communicants of the church, govern the actions of the personnel of St. Paul's.

Plaintiff Peggy Podolinski met Father Reed at a church sponsored spiritual retreat in May of 1991. In October or November of 1991 Reed invited Podolinski to begin attending prayer sessions at St. Paul's. Reed also began seeing Podolinski privately for spiritual guidance and counseling. Podolinski believed that she could trust Reed to guide her through her spiritual problems in a secure and caring atmosphere.

Reed met with Podolinski to counsel her with regard to spiritual matters from November 1991, through May 1992. Over time the content of the sessions became more personal in nature and Reed began to reveal intimate details of his marital and sexual life, drinking habits, personal health matters, and his desires, failings, and fantasies. Reed began hugging Podolinski for extended periods of time, kissing her, and telling her that he loved her, while assuring her that he would not hurt her. Reed eventually began to sexually fondle Podolinski. Reed assured Podolinski that this activity was not wrong according to the church as long as they did not remove their clothing.

Initially, Peggy Podolinski mistook Father Reed's inquiries into her intimate life, confessions as to his own intimate life, and hugging and kissing for spiritual love and security. As Reed became more overtly sexual, however, she began to have doubts about Reed's behavior. Podolinski began to experience extreme emotional distress. In March of 1992, Podolinski told him that she thought the situation had gone too far. Reed reassured her that no harm had been done, and he continued to pursue a sexual relationship with her. The fact that Reed introduced his own alcohol and sexual problems into his counseling relationship with Podolin-

ski caused her to feel a need to protect him and maintain his good will. Although Podolinski experienced increasing doubts and conflict, she was too emotionally enmeshed with Reed to end the relationship at that time.

Peggy Podolinski discontinued the relationship with Father Reed in May of 1992. Reed insisted that he wanted to remain friends, but called Podolinski several times telling her not to disclose their relationship. Reed also told Podolinski that his wife was afraid that Reed was going to get in trouble "this time."

During the relationship, Peggy Podolinski was depressed and distraught. She and her husband Lanny experienced marital difficulties, and began counseling with another counselor.

On June 15, 1992, plaintiffs met with Bishop Hathaway and delivered a written complaint against Father Reed. On July 27, 1992, the bishop told Podolinski that Reed was not a risk in the ministry and that she had no proof of her allegations. After plaintiffs indicated that they would not drop their complaint, Bishop Hathaway referred the matter to the review commission, a body charged with advising him with respect to disciplinary matters in the ministry. The review commission declined to deal with the matter because Bishop Hathaway had already made a decision and thus had bypassed the commission. The commission recommended to the standing committee that it should make a determination as to the veracity of Podolinski's charges and decide whether Reed should stand trial in accordance with canon 19 of the diocesan canons.

On October 13, 1992, Bishop Hathaway began pressuring Podolinski to meet with him and a commission therapist without disclosing to her that the purpose of the meeting was to convince her to accept a letter of reprimand as discipline for Father Reed and to reconcile

with the church, thus negating the need for a canon 19 trial.

On November 1, 1992, Podolinski again met with the bishop and the therapist. When Podolinski complained that Bishop Hathaway was not straightforward about the disciplinary process, Bishop Hathaway stated that nothing more could be done. At Podolinski's insistence, however, the bishop conceded that she could bring formal charges against Reed to the standing committee. He indicated that he would assist her in this process.

Podolinski filed a complaint against Reed with the standing committee. She performed all tasks required of her by Diocese officials, including submitting to an interview with the standing committee and submitting to a psychological examination. Podolinski answered repeated questions and complied with all requests for information. The church did not, however, proceed in a timely manner with the complaint proceedings. Father Reed throughout has continued as rector of St. Paul's and continues to counsel its communicants.

Reed harmed Podolinski by denying her allegations and using the church officials and processes to insulate himself from the allegations. The Diocese, St. Paul's, and Bishop Hathaway have harmed Podolinski by trivializing the harm done to her by Reed, failing to discipline Reed, and repeatedly questioning her about the incidents.

The plaintiffs continue to require counseling and to experience marital difficulties because of Reed's actions.

### Part A—Alleged Causes of Action

Plaintiffs' complaint alleges the following five causes of action against Father Reed: negligence, breach of

fiduciary duty, intentional infliction of emotional distress, loss of consortium, and punitive damages.

Plaintiffs' complaint alleges the following five causes of action against the Diocese, Bishop Hathaway, St. Paul's, and Englert: vicarious liability for Reed's negligence; negligent hiring, training, and supervision; breach of fiduciary duty; intentional infliction of emotional distress; and loss of consortium.

## Part B—Negligence

In Count I of their complaint against Reed, plaintiffs allege that Reed was negligent in the way he counseled Podolinski. The specific acts which individually or collectively are said to have constituted such negligence are numerous and are set forth in detail in the complaint. The essential allegations, however, are that Father Reed, in counseling Podolinski, created and maintained a detrimental dual relationship with her, misled her into believing that there was nothing improper about it, and generally failed to abide by counseling standards and professional behavior policies established by the Diocese and the church.

Reed has demurred to the negligence count[1] and in doing so, he has styled it as a count alleging clergy malpractice. The court believes that the count does indeed sound in professional negligence or malpractice, and therefore, the court too will refer to it as the clergy malpractice cause of action.[2]

---

1. Defendants Diocese, Bishop Hathaway, St. Paul's and Englert have also demurred to the clergy malpractice cause of action insofar as it is alleged to be the underlying tort in the vicarious liability count in the complaint against them. See part C, below.

2. *Clergy malpractice* is the phrase used in almost all the legal literature pertaining to the subject.

Reed's demurrer asserts that a claim for clergy malpractice is not a cognizable cause of action for constitutional reasons. Specifically, he asserts that recognition of such a cause of action would violate the First Amendment to the Constitution of the United States and Article I, Section 3 of the Pennsylvania Constitution.

The First Amendment, of course, prohibits state interference with the practice of religious faith and prohibits the establishment of a state religion. *Cantwell v. Connecticut,* 310 U.S. 296, 84 L.Ed. 1213 (1940). The First Amendment is applicable to the states through the Fourteenth Amendment. *Cruz v. Beto,* 405 U.S. 319, 31 L.Ed.2d 263 (1972).

The parameters within which state action must be evaluated to determine whether it violates the First Amendment to the Constitution of the United States were set forth by the United States Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 29 L.Ed.2d 745 (1971). In that case, the Supreme Court of the United States was asked to review the constitutionality of a Rhode Island statute which provided a salary supplement to teachers in non-public schools so long as they agreed not to teach courses in religion. The Supreme Court declared the statute to be unconstitutional. In reaching its conclusion, the court set forth the following three-pronged test for evaluating whether state action does not violate the establishment clause:

- The purpose of the action must be clearly secular;

- The primary effect of the action must neither enhance nor inhibit religion; and

- The activity must not result in excessive state entanglement with religion.

An examination of what a jury trial[3] concerning Reed's alleged clergy malpractice would entail leads the court to conclude that recognition of the cause of action would result in excessive state entanglement.

In such a trial, several events would occur any or all of which would constitute excessive entanglement. First, plaintiffs' expert witness, probably an Episcopal clergyman but certainly someone well acquainted with the role, duties and function of the Episcopal clergy, would take the witness stand and opine whether Father Reed exercised "ordinary skill, knowledge, and judgment" in his counseling of Podolinski. Second, the court in its charge to the jury would instruct the jurors on the definition of clergy malpractice and, in so doing, would tell the jury that Reed was under a duty to exercise the skill, knowledge and judgment that is ordinarily had and exercised by an Episcopal priest who counsels. Third, and most importantly, the jury would make a decision, backed up by the full authority of the state to enforce judgments, as to what the ordinary level of skill, knowledge and judgment of an Episcopal priest is, and whether Reed's counseling attained that level.

These are exactly the kinds of decisions and actions in which the state should not become entangled under the First Amendment as interpreted in *Lemon v. Kurtzman.* In accord with this conclusion is *Schmidt v. Bishop* 779 F. Supp. 321 (S.D. N.Y. 1991), involving a claim against a Presbyterian minister, in which the court anticipated testimony about how "a reasonably prudent Presbyterian pastor" should have conducted himself in the circumstances peculiar to that case, and *Baumgartner v. First Church of Christ, Scientist,* 490

---

3. A jury trial is "state action." *Shelley v. Kramer,* 334 U.S. 1, 92 L.Ed. 1161 (1948).

N.E.2d 1319 (Ill. 1986), which speaks of "the standard of care of an 'ordinary' Christian Science practitioner." See also, *Destefano v. Grabrian*, 763 P.2d 275 (Colo. 1988), involving a Roman Catholic priest, in which the Supreme Court of Colorado also refused to recognize a cause of action for clergy malpractice on First Amendment grounds, although it did not specifically discuss the necessity of using "a reasonably prudent Roman Catholic priest" standard.

There is only one reported Pennsylvania decision which even touches upon the cognizability of a clergy malpractice cause of action. In *E.J.M. v. Archdiocese of Philadelphia*, 424 Pa. Super. 449, 622 A.2d 1388 (1993), the Superior Court noted without discussion that a trial court had dismissed a count in the plaintiff's complaint alleging clergy malpractice for failure to state a cause of action. (See footnote no. 1 in the Superior Court's opinion.)

Accordingly, Reed's demurrer to the clergy malpractice count will be sustained.

## Part C—Vicarious Liability

In Count I of their complaint against the Diocese, Bishop Hathaway, St. Paul's and Englert, plaintiffs allege that the four defendants are vicariously liable for Reed's negligence. Plaintiffs contend that because Reed was under the direct supervision and control of the four defendants, and Reed's conduct was within the scope of his employment, defendants are jointly, severally and vicariously liable for Reed's negligence.

The Diocese, Bishop Hathaway, St. Paul's and Englert have all filed preliminary objections to this count. These four defendants argue that the facts pleaded in the complaint fail to establish that Reed was under the su-

pervision and control of any of them and that the alleged sexual misconduct was not within the scope of his employment. Additionally, the four defendants argue that, since the alleged tort (clergy malpractice) of the alleged agent or servant (Reed) is not a cognizable claim, they cannot be held vicariously liable for it. (The court notes that the only underlying tort which plaintiffs allege created the vicarious liability is negligence—see paragraph no. 35 of the appropriate complaint.)

For the reasons which follow, the court will sustain the demurrer to the vicarious liability count.

Where the master is joined with his servant in an action based wholly on the servant's conduct, the master cannot be held liable unless there is a cause of action against the servant. *Skalos v. Higgins,* 303 Pa. Super. 107, 449 A.2d 601 (1982). In other words, a cognizable legal claim must first exist against the servant before a master can be liable on a vicarious liability theory for the servant's conduct. If no cognizable legal claim exists against the servant, no claim based on vicarious liability can be made against the master.

Of course, in part B, above, the court ruled that there is no cognizable cause of action against Father Reed for negligence, or clergy malpractice. Therefore, no claim lies against the Diocese, Bishop Hathaway, St. Paul's or Englert on a vicarious liability theory.

The court need not address the other preliminary objections to the vicarious liability count, noted above.

*Part D—Breach of Fiduciary Duty by*
*Diocese et al.*

In Count III of their complaint against the Diocese, Bishop Hathaway, St. Paul's and Englert, plaintiffs allege that these four defendants, as officials of the Epis-

copal Church, breached their fiduciary duty towards Podolinski by failing to adhere to church canons when dealing with her complaint against Father Reed, by delaying the resolution of the complaint, by repeatedly questioning her, by requiring her to undergo a psychological exam, and by permitting Reed to continue as rector of St. Paul's.

These defendants have all preliminarily objected to this count on the basis that the complaint alleges no facts which would create a fiduciary relationship between them on the one hand and Podolinski on the other. Before addressing this preliminary objection directly, it is first necessary to define the tort involved and then take a look at the definition of "fiduciary" and "fiduciary relation."

Section 874 of Restatement (Second) of Torts reads as follows:

"A person standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of the duty imposed by the relationship."

Comment (a) to section 874 helps define *fiduciary* and *fiduciary relation.* The comment reads as follows:

"A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."

Further, Comment (b) to section 2 of the Restatement (Second) of Trusts reads in part as follows:

"A person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation ... Fiduciary relations include not only the relation of trustees and beneficiaries, but also, among others, those of guardians and wards, agents and principals, attorney and client."

The Commonwealth Court of Pennsylvania discussed the concept of a fiduciary relation in *McCarrell v. Cumberland County Employee's Retirement Board,* 120 Pa. Commw. 94, 547 A.2d 1293 (1988). The court stated that one in a fiduciary relationship with another is under a duty to act solely in the interest of that person. *McCarrell, supra* at 100, 547 A.2d at 1296. A careful reading of plaintiffs' complaint reveals two alleged reasons why a fiduciary duty would have arisen on the part of the Diocese, Bishop Hathaway, St. Paul's and Englert in favor of Podolinski. First, they are all church officials according to the complaint.[4] This allegation is insufficient to give rise to a claim that a fiduciary relation existed between any of these four and Podolinski. The mere fact that Hathaway is the bishop of the Diocese is meaningless. In their complaint, plaintiffs have not suggested how this mere status created a fiduciary duty. Without such a suggestion or allegation, it is more logical to conclude that Hathaway, as bishop, had a duty toward all members of his flock and not to Podolinski in particular. In other words, he simultaneously had a duty towards Father Reed, St. Paul's, members of St. Paul's and other communicants in his Diocese. Without allegations of facts that would give rise to a particular duty or canon, it would be absurd to conclude that Bishop Hathaway primarily owed loyalty to Podolinski merely because he was a church official. The same must necessarily be said of Englert. It must also be pointed out that, even if a person can be said to be

---

4. The court does not understand this allegation, since it is obvious that only Bishop Hathaway and Englert can be church officials. The Diocese and St. Paul's are corporations according to the complaint. The incongruous allegations make no difference for purposes of this opinion.

under a duty, it does not necessarily follow that the duty is fiduciary in nature.

Plaintiffs argue that Hathaway, because he is a bishop, who can serve as an arbiter of problems, had a fiduciary duty to Podolinski. Plaintiffs cite *Moses v. Diocese of Colorado,* 863 P.2d 310 (Colo. 1993) in support of this assertion.

A careful reading of *Moses,* however, reveals that the bishop in that case also served as a counselor to the plaintiff. This is a factor of critical importance that is simply not alleged in the complaint filed in the instant matter. *Erickson v. Christiansen,* 781 P.2d 383 (Or.App. 1989) is similarly distinguishable.

A second reason why a fiduciary duty supposedly would have arisen on the part of the Diocese, Bishop Hathaway, St. Paul's and Englert is found in paragraph no. 44 of the complaint. Succinctly stated, this paragraph alleges that these four defendants had a duty as church "officials" to adhere to church canons in handling Podolinski's complaint about Reed because they had held Reed out to be a competent and skilled counselor.

Because the court will dismiss this entire count of the complaint for reasons set forth in part I, below, it will not be necessary to address the issue of whether the four defendants, as church "officials," were made "fiduciaries" by virtue of the church canons. The court will note, however, that such a suggestion by plaintiff is equivalent to her asking the court to enforce her rights under church law, not the civil law.

### Part E—Breach of Fiduciary Duty by Reed

In Count II of their complaint against Reed, plaintiffs allege that he had a fiduciary relationship with Po-

dolinski because he, an ordained priest of the Episcopal Church of which Podolinski was a communicant, was counseling Podolinski, and because, his being privy to Podolinski's personal and confidential communications, he was in a position of trust and confidence with regard to her. It was from this relationship that Reed's fiduciary duty arose, according to plaintiffs' complaint.

Plaintiffs assert that Reed breached his fiduciary duty essentially in the following ways: in creating and maintaining a detrimental dual relationship, in misleading Podolinski into believing that there was nothing improper about it, in failing to terminate it properly, in generally failing to abide by counseling standards and professional behavior policies established by the Diocese and the church, and in misrepresenting the facts about his relationship with Podolinski to the diocesan personnel and agents who subsequently investigated the situation.

Reed has demurred to this breach of fiduciary duty count. His objection is based on his assertion that the recognition and trial of a cause of action for breach of fiduciary duty would constitute excessive entanglement by the state in religious matters, just as he argued in connection with the negligence or clergy malpractice cause of action.

The court will overrule Reed's demurrer on this count for the following reasons.

Father Reed contends that the fiduciary duty count is only a restatement of the claim of clergy malpractice. Reed argues, and this court has agreed, that clergy malpractice is not recognized as a cause of action in Pennsylvania. The tort of breach of fiduciary duty, however, cannot be equated to clergy malpractice. In a clergy malpractice action, the finder of fact would have to determine the levels of skill, knowledge, and judgment

that are ordinarily exercised by an Episcopal priest. A breach of fiduciary duty action, on the other hand, does not require such an inquiry and determination. As outlined in part D above, a fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation. Restatement (Second) of Torts, §874. The cause of action for breach of fiduciary duty would not require the finder of fact to examine the duty of care owed by an Episcopal priest. The finder would only have to decide whether Reed was under a duty to act for or give advice to Podolinski, and whether by his actions, he breached that duty.

Pennsylvania courts have yet to address the viability of a claim for the breach of fiduciary duty between a clergyman who counsels and the counseled party. This court does, however, find guidance in the rulings of the Supreme Court of Colorado in *Destefano v. Grabrian,* 763 P.2d 275 (Colo. 1988) and *Moses v. Diocese of Colorado,* 863 P.2d 310 (Colo. 1993).

In *Destefano v. Grabrian, supra,* Grabrian, a Catholic priest who was counseling the plaintiff, developed a sexual relationship with her. The *Destefano* court found that although the plaintiff did not have a cause of action for clergy malpractice, she did have a cause of action based on breach of fiduciary duty.

In the later case of *Moses v. Diocese of Colorado, supra,* the Colorado Supreme Court, citing the *Destefano* decision, distinguished a breach of fiduciary duty claim from a clergy malpractice claim as follows:

"*Destefano* held that a cause of action for breach of fiduciary duty was separate and distinct from a claim of clergy malpractice. The fundamental difference between the two causes of action is the former is a breach

of trust and does not require a professional relationship or a professional standard of care, while the latter is an action for negligence based on a professional relationship and a professional standard of care." *Id.* at 321 n.13.

The court agrees with the reasoning of the Colorado court. Therefore, Podolinski may proceed with her claim that Reed breached his fiduciary duty to her.

### Part F—Negligent Hiring, Training, and Supervision

In Count II of their complaint against the Diocese, Bishop Hathaway, St. Paul's, and Englert, plaintiffs allege that the four were negligent in the hiring, supervision, and training of Father Reed. Plaintiffs contend that the four defendants breached their duty to properly hire, train, and supervise Reed because they failed to discover that Reed was not sufficiently trained and experienced in counseling, that he had problems with alcohol and his personal life, and that he had a propensity to engage in dual relationships with female communicants.

The court notes that the tort of negligent hiring, training, and supervision is the subject of section 213 of the Restatement (Second) of Agency, which reads as follows:

"A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:

"(a) in giving improper or ambiguous orders or in failing to make proper regulations; or

"(b) in the employment of improper persons or instrumentalities in work involving risk of harm to others;

"(c) in the supervision of the activity; or

"(d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control." Section 213 has been adopted as the law of the Commonwealth. *Dempsey v. Walso Bureau Inc.,* 431 Pa. 562, 246 A.2d 418 (1968).

The Diocese, Bishop Hathaway, St. Paul's, and Englert have preliminarily objected to this count, advancing several different reasons why it should be dismissed.

First, the Diocese and Bishop Hathaway argue that recognition of such a cause of action would constitute excessive entanglement of the state in religion, in violation of both the First Amendment of the U.S. Constitution and Article I, Section 3 of the Constitution of the Commonwealth. Although the court was receptive to this excessive entanglement argument in the context of the clergy malpractice cause of action, it does not believe that the same argument is valid regarding the instant count. In connection with the former count, the state's action *(i.e.,* the jury trial) would define the duty of care owed by an Episcopal priest engaged in spiritual counseling—an activity that is religious in nature. In connection with the instant count, the state's action would define the duty of care owed by the church in hiring, training, and supervising its employees—an activity that is not as intrinsically religious as spiritual counseling. Importantly, religious institutions are constitutionally subject to some degree of regulation. *Geary v. Visitation of the Blessed Virgin Mary,* 7 F.3d 324 (3rd Cir. 1993). In *Geary,* the court of appeals held that the "simple prohibitions" of the Age Discrimination in Employment Act, when applied to a parochial school employment situation, did "not present a significant risk of entanglement." *Id.* at 328. The "simple pro-

hibitions" of which the court spoke *(i.e.,* the prohibition against discriminating against those who are 40 years of age or older) are not so different from the "prohibitions" which the court in the instant matter would be imposing if it recognizes a cause of action for negligent hiring, training, and supervision *(i.e.,* the prohibition against hiring an employee who is likely to cause harm and against inadequately training and supervising such a person if hired).

Accordingly, the argument relating to excessive entanglement will be dismissed.

The Diocese and Bishop Hathaway have also demurred to the negligent hiring, training, and supervision count because of plaintiffs' alleged failure to plead "facts which would establish an employee/employer or servant/master relationship between Reed and [them]."

A review of the complaint reveals that plaintiffs have pled that the Diocese, Bishop Hathaway, St. Paul's and Englert "were responsible for the hiring, supervision, and training of Reed" (Paragraph no. 38); that Reed "was selected by the Vestry of St. Paul's to serve as rector, subject to the approval of Bishop Hathaway" (Paragraph no. 6); that Reed "was under the direct supervision and control of the Diocese, Bishop Hathaway, St. Paul's and Englert when he performed" the counseling (Paragraph no. 33); and that "Reed's conduct was within the scope of his employment as rector of St. Paul's." (Paragraph no. 34.)

Taken together, these allegations are sufficient to plead a master-servant or employer-employee relationship. The issue may be addressed again, if discovery so warrants, by the filing of a motion for partial summary judgment.

St. Paul's and Englert have demurred to this particular count of the complaint against them on the basis that

it does not allege that St. Paul's was responsible for the selection of Reed as its rector. Paragraph no. 38 of the complaint, however, directly states in part that St. Paul's was indeed responsible for the hiring of Reed. Further, paragraph no. 5 alleges that personnel decisions at St. Paul's are made by its Vestry, the head of which is a defendant in this matter. Accordingly, this argument may be dismissed as being without merit.

Lastly, the Diocese, Bishop Hathaway, St. Paul's and Englert have all demurred to this count, arguing that no facts have been pled which would have put any of them on notice that Reed had a propensity to engage in sexual relationships with those women whom he counseled. A review of the complaint reveals that it does indeed fail to allege any such facts. It does, however, allege that the four knew or should have known about Father Reed's propensity and his insufficient training and experience in counseling (Paragraph no. 40) and that he had engaged in similar relationships with other women whom he counseled. (Paragraph no. 16.) Because Pa.R.C.P. 1019 only requires that knowledge and other conditions of the mind be averred generally, and because the complaint generally alleges that the Diocese, Bishop Hathaway, St. Paul's and Englert knew or should have known, this argument will be dismissed as well.

### Part G—Intentional Infliction of Emotional Distress by Reed

Count III of the complaint against Reed alleges that he intentionally inflicted emotional distress upon Podolinski. Plaintiffs rely upon the same factual allegations to support this cause of action as they asserted in their cause of action for breach of fiduciary duty, and in addition, the further allegation that Reed has in the

past generally denied the facts which form the basis for the instant lawsuit.

As a result, say plaintiffs, Podolinski has suffered "great mental anguish, has been hospitalized, has suffered occupational damage, has suffered damage to her ability to be treated effectively by therapists, cannot reconcile herself to the church, will require therapy in the future, and ... will incur medical expenses for hospitalization and therapy." (See paragraph 44 of the complaint against Reed.)

Reed has demurred to this count, asserting that the count fails to allege a cause of action. Reed argues that the count must fail because plaintiffs have not alleged that Podolinski suffered physical injury or illness as a result of the alleged outrageous conduct, and because the conduct complained of is not outrageous as a matter of law.

Reed's contention that the count fails because Podolinski has not suffered physical injury is without merit.

Pennsylvania law recognizes causes of action for both negligent infliction of emotional distress and intentional infliction of emotional distress. The law in Pennsylvania is clear that to succeed in an action for negligent infliction of emotional distress, plaintiff must show that physical harm or injury was suffered.

Podolinski, however, does not allege Reed's negligent infliction of emotional distress, but rather alleges his intentional infliction of emotional distress. This court, in its March 5, 1993 ruling in *Wofford v. Louis K. Hauber,* (no. 1989-0189-Civil, per President Judge Nickleach), found that a physical injury or illness is not necessary for the tort of intentional infliction of emotional distress to be established.

As discussed by this court in *Wofford*, the Pennsylvania Superior Court has interpreted an opinion by the Pennsylvania Supreme Court[5] to require an allegation of physical harm in an action for intentional infliction of emotional distress. *Abadie v. Riddle Memorial Hospital*, 404 Pa. Super. 8, 589 A.2d 1143 (1991). A close reading of *Kazatsky*, however, reveals that while the Supreme Court requires reliable medical evidence of severe emotional distress, it does not require that the medical evidence show any physical harm. *Kazatsky v. King David Memorial Park*, 515 Pa. 183, 197, 527 A.2d 988, 995 (1987). Physical harm, therefore, while it may be evidence in an action for the intentional infliction of emotional distress, is not a necessary element to sustain the action.

Reed next contends that Podolinski's claim for the intentional infliction of emotional distress must fail because the conduct complained of is not outrageous as a matter of law. This court is not prepared to rule at this time that Reed's conduct was not outrageous as a matter of law.

Podolinski may proceed with her claim of Reed's intentional infliction of emotional distress.

*Part H—Intentional Infliction of Emotional Distress by the Diocese, Bishop Hathaway, St. Paul's and Englert*

In Count IV of their complaint against the four defendants, plaintiffs allege that their acts which together constitute the negligent hiring, training and supervision of Reed, their acts which together constitute their breach of their fiduciary duty to Podolinski, their initial

---

5. *Kazatsky v. King David Memorial Park*, 515 Pa. 183, 527 A.2d 988 (1987).

refusal to permit her to have her husband and her lawyer with her when she appeared before the standing committee for questioning, and Bishop Hathaway's attempt to convince her to drop her complaint, constitute outrageous conduct sufficient to support a cause of action for the intentional infliction of emotional distress.

As a result of the outrageous conduct, plaintiffs claim that Podolinski has "suffered great mental anguish, has been hospitalized, has suffered occupational damage, has suffered damage to her ability to be treated effectively by therapists, cannot reconcile herself to the church, will require therapy in the future, and has incurred and will incur medical expenses for hospitalization and therapy."

The Diocese, Bishop Hathaway, St. Paul's, and Englert have demurred to this count, asserting that there are. two different reasons why the count fails to allege a cause of action: first, plaintiffs have failed to allege that Podolinski suffered physical injury or illness as a result of the alleged outrageous conduct; second, the conduct complained of is not outrageous as a matter of law.

The court need not address either of these arguments because, for the reasons enunciated in part I, below, it will dismiss this count for lack of subject matter jurisdiction.

## Part I—Subject Matter Jurisdiction

It has thus far not been mentioned in this opinion that all defendants have preliminarily objected to all counts of the particular complaint filed against them on the ground that the court lacks subject matter jurisdiction to adjudicate the issues raised thereby.

The objection to this court's subject matter jurisdiction is based on the "deference rule," first enunciated by the U.S. Supreme Court in *Watson v. Jones,* 80 U.S. 679, 20 L.Ed. 666 (1871).[6] That case revolved around the attempt of the national body of the Presbyterian Church to regain possession of a church property in Louisville that had been seized by a group of pro-slavery dissidents. In deferring to the ruling concerning ownership made by the national body, the court stated:

"Whenever the *questions of discipline, or of faith, or ecclesiastical rule, custom, or law* have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them in their application to the case before them." *Watson, supra,* 80 U.S. at 727. (emphasis supplied)

Quoting a decision of the Pennsylvania Supreme Court, the *Watson* court further stated:

"The decisions of ecclesiastical courts, like every other judicial tribunal, are final; as they are the best judges of what constitutes an offense against the word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline, and doctrine; and civil courts, if they be so unwise as to attempt to supervise their judgments on matters which come [before] their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do any thing but improve either religion or good morals." citing *The German Reformed Church v. Seibert,* 3 Pa. 282, 291 (1846). *Watson, supra* 80 U.S. at 732.

---

6. For an excellent history of the deference rule, see *Presbytery of Beaver-Butler v. Middlesex Presbyterian Church,* 507 Pa. 255, 489 A.2d 1317 (1985).

The ruling in *Watson v. Jones* was not based on First Amendment grounds. The deference rule, however, did explicitly become part of the body of First Amendment law in *Kedroff v. St. Nicholas Church,* 344 U.S. 94, 97 L.Ed. 120 (1952), a suit involving ownership of the property of the Russian Orthodox Church.

The deference rule was also the subject of focus in *Serbian Eastern Orthodox Diocese v. Milivojevich,* 427 U.S. 696, 49 L.Ed.2d 151 (1976). In this case, a bishop of the Serbian Orthodox Church who had been defrocked by the Holy Assembly of Bishops and the Holy Synod of the Serbian Orthodox Church instituted a lawsuit in the state courts of Illinois to have himself declared the true bishop of the diocese he had been heading and to enjoin church officials from interfering with certain church property in the diocese. In a counterclaim, the church officials sought a declaration that the plaintiff had been properly removed from his office and that the diocese had been properly reorganized, thereby giving them control over the disputed property. The Supreme Court of Illinois held that (1) the church's defrockment of the bishop must be set aside as arbitrary because the church proceedings against him had not been conducted in accordance with the court's interpretation of the church's constitution, penal code and internal regulations, and (2) the church's reorganization of the diocese was beyond the scope of the church's authority to effectuate such changes without the approval of the diocese.

The U.S. Supreme Court reversed the Supreme Court of Illinois on constitutional grounds, holding that the actions of the state court contravened the First Amendment (applicable to the states by virtue of the Fourteenth Amend-

ment) as constituting improper inquiries into matters of ecclesiastical cognizance and polity, and impermissible judicial interference with decisions of the highest authorities of a hierarchical church. Under the U.S. Supreme Court's ruling, it was immaterial that the church authorities' actions were "arbitrary" in the sense they were not done in accordance with church laws and regulations, and the inquiry by the civil court was impermissible because it was bound to accept the decisions of the church authorities "on matters of *discipline,* faith, internal organization, or ecclesiastical rule, custom or law." See *Serbian Eastern Orthodox Diocese, supra,* 49 L.Ed.2d at 165. (emphasis added) Furthermore, and importantly, the Supreme Court opined that a civil court's inquiry into whether church law or regulation has been complied with "must *inherently* entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church adjudicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. *But this is exactly the inquiry that the First Amendment prohibits. ... " Id.* (emphasis added)

With the foregoing in mind, it becomes apparent that the deference rule does not bar this court from adjudicating any of plaintiffs' alleged causes of action against Reed (clergy malpractice,[7] breach of fiduciary duty and intentional infliction of emotional distress), since none of them would entail this court's inquiry or review of the decisions of church authorities on matters of "discipline, faith, internal organization or ecclesiastical rule, custom or law."

---

7. Of course, this count is being dismissed for other reasons stated in part B, above.

The same can be said of the vicarious liability cause of action alleged against the Diocese, Bishop Hathaway, St. Paul's and Englert.[8]

The same cannot readily be stated, however, about the alleged causes of action against these four defendants based on breach of fiduciary duty, negligent hiring, supervision and training, and intentional infliction of emotional distress. A discussion of how each of these causes of action relates to the deference rule is necessary.

As stated above in part D, plaintiffs allege that the four defendants breached a fiduciary duty to Podolinski by failing to adhere to church canons when dealing with her complaint against Father Reed, by delaying the resolution of her complaint, by repeatedly questioning her, by requiring her to undergo a psychological exam and by permitting Reed to continue as rector of St. Paul's.

Succinctly stated, plaintiffs complain about both the manner and the outcome of the investigatory and disciplinary procedures that were started because of Podolinski's complaint about Reed. It seems to the court that its adjudication of whether the four defendants breached a fiduciary duty would necessarily involve an inquiry into the propriety of the decisions of church authorities on matters of discipline, internal organization, ecclesiastical rule, custom, and law. In fact, plaintiffs' breach of fiduciary duty cause of action against the four defendants would *inherently* entail inquiry into these areas; and, as stated by the U.S. Supreme Court in *Serbian Eastern Orthodox Diocese, supra,* "this is exactly the inquiry that the First Amendment prohibits."[9]

---

8. Of course, this cause of action is being dismissed for the reasons recited in part C, above.

9. The court in the instant matter recognizes that the pleadings do not establish whether the decisions of the Diocese and Bishop Hathaway are decisions of the "highest ecclesiastical tribunal" within

The court does not believe, however, that the deference rule bars it from asserting subject matter jurisdiction over the cause of action pertaining to negligent hiring, training, and supervision.

The deference rule's purpose is to require a civil court to defer to the decisions of church in resolving internal disputes. Plaintiffs' allegation of negligent hiring, training and supervision does not pertain to the resolution of an internal dispute within the church. Accordingly, the deference rule plays no role regarding this count.

In determining whether or not the court has subject matter jurisdiction over plaintiffs' cause of action against the Diocese, Bishop Hathaway, St. Paul's and Englert for intentional infliction of emotional distress, it is necessary first to look closely at the complaint and discern the conduct which allegedly gave rise to the tort. In so doing, one can see that the alleged tortious conduct consists of the following:

• the negligent hiring, supervision and training of Reed;

---

the Episcopal Church, which is what the U.S. Supreme Court said must be given deference in *Serbian Eastern Orthodox Diocese, supra.* Whether the instant case involves decisions of the highest tribunal or of some intermediate tribunal is logically of no import. See *Young v. Northern Illinois Conference of United Methodist Church,* 21 F.3d 184 (7th Cir. 1994). The court distinguishes the case at bar and *Young* from *Poesnecker v. Ricchio,* 158 Pa. Commw. 459, 631 A.2d 1097 (1993). In *Poesnecker,* the Commonwealth Court arguably placed great weight on the *"highest* ecclesiastical tribunal" requirement. However, a close reading of the case reveals that the contestants were "church" authorities of equal stature or rank within their religious body. In *Poesnecker,* there was simply no decision of a higher church authority to which the courts could defer, and a literal reading of the written organic laws of the body was capable of providing the basis for a resolution of the dispute.

- the same conduct which constituted the breach of fiduciary duty;

- their initial refusal to permit Podolinski to have her husband and her lawyer present with her when she appeared before the standing committee for questioning; and

- Hathaway's attempt to convince Podolinski to withdraw her complaint.

For reasons stated in this part, above, the court would appear to have subject matter jurisdiction over the first category, but not the second (the third and fourth are really part of the second—they too involve the internal disciplinary procedures utilized in the instant case). Accordingly, the court will invoke the deference rule with regard to the entire intentional infliction cause of action, except that it will permit plaintiffs to proceed under the same insofar as it relates to Reed's hiring, training and supervision. Permitting an inquiry into the disciplinary and investigatory procedure is barred.

## Part J—Loss of Consortium

In their preliminary objection, all defendants have sought dismissal of all counts lodged against them in which Podolinski herself seeks money damages. They have also sought dismissal of the loss of consortium counts of the two complaints, arguing that since all of the others fail, the loss of consortium claims must also fail.

It is true, of course, that a loss of consortium action is derivative. Its success is dependent upon the injured spouse's right to recover. *Scattaregia v. Shin Shen Wu,* 343 Pa. Super. 452, 495 A.2d 552 (1985). It is also true that where the injured spouse's claims are found to be not actionable, the derivative loss of consortium

claim fails, as well. *Kryeski v. Schott Glass Technologies Inc.,* 426 Pa. Super. 105, 626 A.2d 595 (1993). In the case at bar, at least one cause of action against Reed will survive his preliminary objections and at least one against the Diocese, Bishop Hathaway, St. Paul's and Englert will likewise survive. Therefore, the claims for loss of consortium must necessarily also survive the preliminary objections.

## Part K—Motion for More Specific Pleading

Defendants St. Paul's and Englert have filed a motion for more specific pleading, asserting that plaintiffs' complaint against them merely makes reference in many places to "defendants" as actors, without stating specifically "which defendants allegedly did what." The court readily admits that much of the complaint does so read. However, since only certain portions of plaintiffs' complaint against St. Paul's and Englert will survive the preliminary objections, and since those portions pertain only to the allegations of negligent hiring, training, and supervision, the court will dismiss this preliminary objection and will not require the filing of an amended complaint for lack of specificity.

## Part L—The Pennsylvania Constitution

The defendants, as stated above, have all raised constitutional defenses of one sort or another, basing them not only on the First Amendment to the U.S. Constitution but also on Article I, Section 3 of the Pennsylvania Constitution. The court, of course, has sustained certain of these preliminary objections on First Amendment grounds, and has overruled certain others using First Amendment analyses. The court does not believe that the Pennsylvania Constitution provides defendants any

broader protections than does the First Amendment in the context of this case.

An appropriate order will be entered.

ORDER

And now, March 22, 1995, for the reasons set forth in the foregoing opinion, it is hereby ordered, adjudged and decreed as follows:

*Podolinski v. Reed* (1994-0277-Civil)

(1) Defendant Reed's demurrer to Count I of plaintiffs' complaint against him, pertaining to negligence, is sustained.

(2) Defendant Reed's demurrer to Count IV of plaintiffs' complaint against him, pertaining to loss of consortium, is sustained to the extent that such loss is alleged to have arisen from the cause of action dismissed by virtue of paragraph no. 1 of this order.

(3) All other preliminary objections of defendant Reed to plaintiffs' complaint are overruled.

*Podolinski v. Diocese et al.* (1994-0831-Civil)

(4) The demurrers of defendants Diocese and Bishop Hathaway and of defendants St. Paul's and Englert to Count I of plaintiffs' complaint against them, pertaining to vicarious liability, are sustained.

(5) The preliminary objections of defendants Diocese and Bishop Hathaway and of defendants St. Paul's and Englert to the court's subject matter jurisdiction over Count III of the complaint against them, pertaining to breach of fiduciary duty, is sustained.

(6) The preliminary objections of defendants Diocese and Bishop Hathaway and of defendants St. Paul's and Englert to the court's subject matter jurisdiction over Count IV of the complaint against them pertaining to intentional infliction of emotional distress are sustained,

except insofar as said count relies upon allegations of negligent hiring, supervision, and training.

(7) The preliminary objections of defendants Diocese and Bishop Hathaway and of defendants St. Paul's and Englert to Count VI of the complaint against them, pertaining to loss of consortium are sustained to the extent that such loss is alleged to have arisen from the causes of action dismissed by virtue of paragraphs no. 5 and no. 6 of this order.

(8) All other preliminary objections filed by defendants Diocese and Bishop Hathaway or by defendants St. Paul's and Englert are overruled.

## MEMORANDUM

VALASEK, *J.*, May 12, 1995—The court by virtue of its order dated March 22, 1995 ruled on certain preliminary objections filed by the defendants in the above-captioned matter, and on certain preliminary objections filed in a related matter, to wit, *Peggy Podolinski et ux. v. G. Lyman Reed* (no. 1994-0831-Civil).

The defendants in the above-captioned matter have asked the court to reconsider its refusal to sustain their preliminary objections to the count alleging negligent hiring, training, and supervision. By order dated May 8, 1995, the court granted reconsideration of all issues decided by its earlier order. The court will now enter a new order, identical to the old, except that it will now sustain in part and overrule in part the defendants' demurrers to the negligent hiring, training, and supervision count.

This memorandum accordingly amends part F of the court's opinion dated March 22, 1995.

*Part F—Negligent Hiring, Training, and Supervision*

In Count II of their complaint against the Diocese, Bishop Hathway, St. Paul's, and Englert, plaintiffs allege that the four were negligent in the hiring, supervision, and training of Father Reed. Plaintiffs contend that the four defendants breached their duty to properly hire, train, and supervise Reed because they failed to discover that Reed was not sufficiently trained and experienced in counseling, that he had problems with alcohol and his personal life, and that he had a propensity to engage in dual relationships with female communicants.

The court notes that the tort of negligent hiring, training, and supervision is the subject of section 213 of the Restatement (Second) of Agency, which reads as follows:

"A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:

"(a) in giving improper or ambiguous orders or in failing to make proper regulations; or

"(b) in the employment of improper persons or instrumentalities in work involving risk of harm to others;

"(c) in the supervision of the activity; or

"(d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control."

Section 213 has been adopted as the law of the Commonwealth. *Dempsey v. Walso Bureau Inc.,* 431 Pa. 562, 246 A.2d 418 (1968).

The Diocese, Bishop Hathaway, St. Paul's, and Englert have preliminarily objected to this count, ad-

vancing several different reasons why it should be dismissed.

First, the Diocese and Bishop Hathaway argue that recognition of such a cause of action would constitute excessive entanglement of the state in religion, in violation of both the First Amendment of the U.S. Constitution and Article I, Section 3 of the Constitution of the Commonwealth. Although the court was receptive to this excessive entanglement argument in the context of the clergy malpractice cause of action, it does not believe that the same argument is valid regarding the instant count. In connection with the former count, the state's action *(i.e.,* the jury trial) would define the duty of care owed by an Episcopal priest engaged in spiritual counseling—an activity that is religious in nature. In connection with the instant count, the state's action would define the duty of care owed by the church in hiring, training, and supervising its employees—an activity that is not as intrinsically religious as spiritual counseling. Importantly, religious institutions are constitutionally subject to some degree of regulation. *Geary v. Visitation of the Blessed Virgin Mary,* 7 F.3d 324 (3rd Cir. 1993). In *Geary,* the court of appeals held that the "simple prohibitions" of the Age Discrimination in Employment Act, when applies to a parochial school employment situation, did "not present a significant risk of entanglement." *Id.* at 328. The "simple prohibitions" of which the court spoke *(i.e.,* the prohibition against discriminating against those who are 40 years of age or older) are not so different from the "prohibitions" which the court in the instant matter would be imposing if it recognizes a cause of action for negligent hiring, training, and supervision *(i.e.,* the prohibitions against "knowingly" hiring an employee who is likely to cause harm and against inadequately training

and supervising such a person if hired). If plaintiffs were permitted to now proceed upon a cause of action for the "unknowing" hiring of an employee likely to cause harm, the inquiry of the court and jury would inherently entail an in-depth review of the adequacy and reasonableness of the hiring, training, and supervision policies of the defendants. This would constitute excessive entanglement. On the other hand, plaintiffs need not refer to or use any church laws or procedures, or challenge their reasonableness or adequacy, if the cause of action is limited to the "knowing" hiring of an employee likely to cause harm: plaintiffs must merely prove that Reed was likely to cause the harm he allegedly caused and that defendants "knowingly" hired him nonetheless. The defendants' demurrers are therefore denied insofar as they relate to a "knowing" hiring of an employee who is likely to cause harm, and sustained insofar as they relate to an "unknowing" hiring of such an employee.

The Diocese and Bishop Hathaway have also demurred to the negligent hiring, training, and supervision count because of plaintiffs' alleged failure to plead "facts which would establish an employee/employer or servant/master relationship between Reed and [them]."

A review of the complaint reveals that plaintiffs have pled that the Diocese, Bishop Hathaway, St. Paul's and Englert "were responsible for the hiring, supervision, and training of Reed" (Paragraph no. 38); that Reed "was selected by the Vestry of St. Paul's to serve as rector, subject to the approval of Bishop Hathaway" (Paragraph no. 6); that Reed "was under the direct supervision and control of the Diocese, Bishop Hathaway, St. Paul's and Englert when he performed" the counseling (Paragraph no. 33); and that Reed's conduct was within the scope

of his employment as rector of St. Paul's. (Paragraph no. 34.)

Taken together, these allegations are sufficient to plead a master-servant or employer-employee relationship. The issue may be addressed again, if discovery so warrants, by the filing of a motion for partial summary judgment.

St. Paul's and Englert have demurred to this particular count of the complaint against them on the basis that it does not allege that St. Paul's was responsible for the selection of Reed as its rector. Paragraph no. 38 of the complaint, however, directly states in part that St. Paul's was indeed responsible for the hiring of Reed. Further, paragraph no. 5 alleges that personnel decisions at St. Paul's are made by its Vestry, the head of which is a defendant in this matter. Accordingly, this argument may be dismissed as being without merit.

Lastly, Diocese, Bishop Hathaway, St. Paul's and Englert have all demurred to this count, arguing that no facts have been pled which would have put any of them on notice that Reed had a propensity to engage in sexual relationships with those women whom he counseled. A review of the complaint reveals that it does indeed fail to allege any such facts. It does, however, allege that the four knew about Father Reed's propensity and his insufficient training and experience in counseling (Paragraph no. 40) and that he had engaged in similar relationships with other women whom he counseled. (Paragraph no. 16.) Because Pa.R.C.P. no. 1019 only requires that knowledge and other conditions of the mind be averred generally, and because the complaint generally alleges that the Diocese, Bishop Hathaway, St. Paul's and Englert knew of the problems with Reed, this argument will be dismissed, as well.

## ORDER

And now, May 12, 1995, for the reasons set forth in the annexed memorandum and the court's prior opinion of March 22, 1995, it is hereby ordered, adjudged and decreed as follows:

(1) The demurrers of defendants Diocese and Bishop Hathaway and of defendants St. Paul's and Englert to Count I of plaintiffs' complaint against them, pertaining to vicarious liability, are sustained.

(2) The preliminary objections of defendants Diocese and Bishop Hathaway and of defendants St. Paul's and Englert to the court's subject matter jurisdiction over Count III of the complaint against them, pertaining to breach of fiduciary duty, is sustained.

(3) The preliminary objections of defendants Diocese and Bishop Hathaway and of defendants St. Paul's and Englert to the court's subject matter jurisdiction over Count IV of the complaint against them pertaining to intentional infliction of emotional distress are sustained, except insofar as said count relies upon allegations of negligent hiring, supervision, and training.

(4) The preliminary objections of defendants Diocese and Bishop Hathaway and of defendants St. Paul's and Englert to Count II of the complaint against them pertaining to negligent hiring, supervision, and training are sustained insofar as they relate to an "unknowing" hiring, and are overruled insofar as they relate to a "knowing" hiring.

(5) The demurrers of defendants Diocese and Bishop Hathaway and of defendants St. Paul's and Englert to Count VI of the complaint against them, pertaining to loss of consortium are sustained to the extent that such loss is alleged to have arisen from the causes of action dismissed by virtue of paragraphs nos. 2, 3 and 4 of this order.

(6) All other preliminary objections filed by defendants Diocese and Bishop Hathaway or by defendants St. Paul's and Englert are overruled.