527 A.2d 988

**Harvey and Marsha KAZATSKY, h/w, Appellants,**

**v.**

**KING DAVID MEMORIAL PARK, INC., Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 22, 1986.

Decided June 15, 1987.

184

---

William Goldstein, Philadelphia, for appellants.

Brenden E. Brett, Doylestown, Nelson Romisher, Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA, and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.*

In this appeal we have agreed to decide whether a compulsory nonsuit was appropriately entered in a trespass action seeking recovery for intentional infliction of severe emotional distress by outrageous conduct as defined in section 46 of the Restatement (Second) of Torts. Previously this Court has acknowledged but has never had occasion to specifically adopt section 46 as the law in Pennsylvania.[1] Again, because the evidence adduced in this matter does not establish a right of recovery under the terms of the provision as set forth in the Restatement, we again leave to another day the question of the viability of section 46 in this Commonwealth.

The instant action arose when appellants Harvey and Marsha Kazatsky, husband and wife, filed a complaint in equity and trespass against appellee King David Memorial Park, Inc. ("King David"), a cemetery company organized under the laws of this Commonwealth, in the Court of Common Pleas of Bucks County. The Kazatskys had purchased two plots of land in King David's cemetery for the burial of an infant son and daughter, prematurely born twins who had died shortly after birth. After the interments King David had billed the Kazatskys for the perpetual care and sodding of the gravesites and, when no pay-

---

* This case was reassigned to this writer.

1. Reference was made to section 46 in *Papieves v. Kelly,* 437 Pa. 373, 378, 263 A.2d 118 (1970). The principle adopted in that case, however, was derived from Restatement (First) of Torts § 868 (1939), which provides for liability to a decedent's family member for the wanton mistreatment or intentional withholding of that decedent's corpse. In *Forster v. Manchester,* 410 Pa. 192, 189 A.2d 147 (1963), we rejected a claim which sought to invoke Restatement (First) of Torts § 46 (rev. 1948), which required intent to cause severe emotional distress, because there had been no showing of such intent. We also concluded that the conduct complained of was not "outrageous." Thus it was unnecessary to consider the adoption of section 46, as then written, as the law in Pennsylvania. Various other courts have incorrectly taken the view that this Court has adopted section 46. *See, e.g., Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3d Cir.1979); *Banyas v. Lower Bucks Hospital,* 293 Pa.Super. 122, 437 A.2d 1236 (1981).

ment was forthcoming, had refused to maintain them. The equity count of the Kazatskys' complaint sought to compel King David to care for and maintain the burial plots. That count was later withdrawn by stipulation of counsel when King David relented and began to maintain the gravesites. The Kazatsky's trespass count alleged fraudulent misrepresentation by King David as to the location of the gravesites and the type of monument permitted, a claim which also has been abandoned on appeal, and an intentional infliction of emotional distress by King David in failing to care for the gravesites and demanding payments in addition to the purchase price of the plots.

The case went to trial before a jury on May 7, 1984. After presenting their account of the events giving rise to their suit and offering photographic and documentary evidence, the Kazatskys rested their case, whereupon King David moved for a compulsory nonsuit. The motion was granted and the court en banc refused to remove the nonsuit. On direct appeal the Superior Court affirmed on the opinion of the trial court, 345 Pa.Super. 628, 496 A.2d 858. This Court granted the Kazatskys' petition for allowance of appeal.

Our standard of review in cases in this posture is well-established. On appeal from the refusal to remove a compulsory nonsuit the plaintiff must be given the benefit of all favorable testimony and every reasonable inference arising therefrom, all conflicts in the evidence being resolved in the plaintiff's favor. *Scott v. Purcell*, 490 Pa. 109, 415 A.2d 56 (1980); *DeFrank v. Sullivan Trail Coal Co.*, 425 Pa. 512, 229 A.2d 899 (1967); *Finnin v. Neubert*, 378 Pa. 40, 105 A.2d 77 (1954). The entry of a compulsory nonsuit will be sustained only in a clear case where the only conclusion that can be drawn from the evidence is the absence of liability. *McNally v. Liebowitz*, 498 Pa. 163, 445 A.2d 716 (1982); *McKenzie v. Cost Brothers, Inc.*, 487 Pa. 303, 409 A.2d 362 (1979). Viewed in accordance with these principles the evidence established the following facts:

Marsha Kazatsky gave birth to twins, a boy and a girl, on June 27, 1981, in the sixth month of her pregnancy. The boy, Jeremy, died on June 29, 1981. Harvey Kazatsky contacted his rabbi concerning burial arrangements and was referred to King David. Apparently the rabbi had previous dealings with the cemetery which were satisfactory, thus occasioning the referral in this instance. Mr. Kazatsky telephoned King David and spoke with a Mr. Jack Livesy, who informed him that land was available in the infant section of the cemetery and that only flat grave-markers were permitted in that area. The total charge quoted for a burial plot was One Hundred Eighty Dollars ($180.00); One Hundred Dollars ($100.00) for the gravesite and Eighty Dollars ($80.00) for opening the grave. No further charges were discussed at that time. Mr. Kazatsky agreed to purchase a gravesite. Jeremy's funeral took place on June 30, 1981. At the time of interment, Livesy introduced himself to Mr. Kazatsky at the gravesite. When the funeral director arrived with the body, Livesy asked Mr. Kazatsky if he would like to make settlement on the bill. Mr. Kazatsky, who had expected to be asked to pay that day, complied with the request.

On July 7, 1981, the sister, Toby, died. Similar arrangements were made with King David and Livesy again requested and received payment at graveside. Marsha Kazatsky was not informed by her husband of the payment arrangement until after both funerals were over.[2]

At some time after the funerals the Kazatskys inspected the area surrounding the twins' graves and noticed a number of adult graves with standing tombstones. Although the record reflects that there were childrens' graves in this area, there is no contention that any of those graves possessed standing headstones. The Kazatskys also expressed dissatisfaction with the location because they were in the

2. The Kazatskys do not argue on appeal that these graveside requests for payment constituted part of the tortious behavior for which damages were being sought. We note that it is normal practice for a cemetery to require payment for a plot prior to interment, unless the parties had made other arrangements.

remotest and most inaccessible area of the cemetery. It was further contended that the area also became muddy when wet. Mr. Kazatsky purchased a gravemarker from Wertheimer Monuments, Inc. ("Wertheimer").

The Kazatskys received a bill from King David in late April of 1982 requesting One Hundred Forty-three Dollars ($143.00). The Kazatskys subsequently received a printed card explaining that One Hundred Dollars ($100.00) was the "special price" for perpetual care and Forty-three Dollars ($43.00) was the fee for sodding the burial plots. At this point the Kazatskys did not communicate with King David with reference to the propriety of this subsequent bill, although they testified that they were surprised to receive it.

In mid-May of 1982 Wertheimer informed the Kazatskys that the grave-marker had been completed and would be installed upon payment of the balance due.[3] The balance was paid in full to Wertheimer on May 24, 1982, and the Kazatskys subsequently received a card from Wertheimer informing them that the marker had been installed. When they visited the cemetery on June 1, 1982, there was no marker on their children's grave-sites. The Kazatskys went to the King David office, where they spoke with a Mrs. Livesy. When asked where the marker was, Mrs. Livesy checked the Kazatskys file and informed them that there was an unpaid balance on the bill for perpetual care and sodding. Mrs. Livesy also informed the Kazatskys that monument companies only delivered markers and King David personnel did the installing. The Kazatskys were upset and said they would bring money to the scheduled unveiling to pay the bill. Mrs. Livesy rejected that arrangement and demanded payment prior to installation. The Kazatskys left "furious and extremely upset" (RR 62a), and sought the advice of counsel.

3. The notice did not expressly state that the installation would be done by Wertheimer. Further, it is to be emphasized that Wertheimer and King David are separate business entities.

The Kazatskys later sought clarification from Wertheimer and asked why the marker had not been installed. They were referred to a Mrs. Reinick, one of the owners of King David, and explained their situation to her over the telephone. Mrs. Reinick agreed to look into the matter. After speaking with her, the Kazatskys contacted the Bucks County and Pennsylvania Consumer Protection Agencies.

Mrs. Reinick called the Kazatskys three days later and informed them the marker would be installed and they could hold their unveiling, but that there would be no care or maintenance of the grave-sites unless the bill was paid. Mr. Kazatsky related his reaction to this announcement as follows:

> I wasn't terribly thrilled with it, but the most important thing, the only important thing at that point was having the unveiling on the 13th, so we accepted what was said and just left it alone.

RR 66a.

The unveiling took place during a "torrential downpour" with only the Kazatskys, their two surviving sons and their rabbi attending. The party left after a brief service but when they were half-way up the road out of the cemetery, a car drove up towards them. Mrs. Reinick emerged from that vehicle and expressed her condolences, and reminded the Kazatskys that there would be no care or maintenance unless the One Hundred Forty-three Dollars ($143.00) fee was paid. The Kazatskys found this "infuriating and extremely upsetting." RR 69a. As a result of this incident, the Kazatskys decided not to pay the disputed bill.

During the summer of 1982 the Kazatskys observed deteriorating conditions at the grave-sites, including crabgrass and weeds, during their visits. By December of 1982 the marker had begun to tip and sink for lack of a foundation and surrounding sod. The Kazatskys filed their lawsuit against King David in February of 1983.

Harvey Kazatsky conceded on cross-examination that throughout their dispute with King David the Kazatskys did not seek medical or psychiatric counselling. On redirect

he explained that they were very supportive of each other and did not feel they needed professional help.

The Kazatskys' claim for damages for emotional distress is based on King David's alleged use of threats to coerce them into purchasing a perpetual care contract for their deceased children's grave sites. Specifically they complain of King David's communication of its refusal to (1) permit the installation of the grave marker; (2) allow the unveiling ceremony; [4] and (3) provide care and maintenance for the grave sites. The Kazatskys' attempt to bring these contacts with King David within the parameters of a cause of action under section 46 of the Restatement (Second) of Torts for outrageous conduct causing severe emotional distress.

■ The gravamen of the tort of intentional infliction of emotional distress is outrageous conduct on the part of the tortfeasor. Section 46(1) of the Restatement (Second) of Torts, on which the Kazatskys rely, provides as follows:

§ 46. **Outrageous Conduct Causing Severe Emotional Distress**

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

The availability of recovery under section 46 is highly circumscribed. The tortious conduct contemplated by the drafters of section 46 is described in their commentary:

d. *Extreme and outrageous conduct.* The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree

---

**4.** Although appellant treats (1) and (2) as separate complaints, the threatened disturbance of the unveiling ceremony was only a consequence of the uncertainty of the installation of the gravemarker.

of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's [sic] feelings are hurt. Restatement (Second) of Torts § 46 comment *d.* (1965).

We are not required here to determine whether King David's conduct reached the level of "outrageousness" that would support recovery of money damages under section 46, because of a glaring failure in the chain of proof required to establish this claim. The Kazatskys presented no expert testimony, indeed no evidence at all except their own unsubstantiated averments, concerning their alleged injuries. To permit recovery on the basis of such a questionable showing would necessitate a radical departure from settled principles of Pennsylvania tort doctrine.

For decades this Court uniformly applied the "impact rule," which barred recovery for fright, nervous shock or mental or emotional distress unless it was accompanied by a physical injury or impact upon the complaining party. *See Knaub v. Gotwalt,* 422 Pa. 267, 220 A.2d 646 (1966); *Cucinotti v. Ortmann,* 399 Pa. 26, 159 A.2d 216 (1960); *Bosley v. Andrews,* 393 Pa. 161, 142 A.2d 263 (1958); *Gefter v. Rosenthal,* 384 Pa. 123, 119 A.2d 250 (1956); *Potere v. City*

*of Philadelphia,* 380 Pa. 581, 112 A.2d 100 (1955); *Hess v. Philadelphia Transportation Co.,* 358 Pa. 144, 56 A.2d 89 (1948); *Koplin v. Louis K. Liggett Co.,* 322 Pa. 333, 185 A. 744 (1936); *Howarth v. Adams Express Co.,* 269 Pa. 280, 112 A. 536 (1921); *Samarra v. Allegheny Valley St. Ry. Co.,* 238 Pa. 469, 86 A. 287 (1913); *Huston v. Freemansburg Borough,* 212 Pa. 548, 61 A. 1022 (1905); *Linn v. Borough of Duquesne,* 204 Pa. 551, 54 A. 341 (1903); *Ewing v. Pittsburgh C. & St. L. Ry. Co.,* 147 Pa. 40, 23 A. 340 (1892). The common law rationale for the impact rule is embodied in the often-quoted statement of Lord Wensleydale in *Lynch v. Knight,* 9 H.L.Cas. 557, 598, 11 Eng.Rpts. 854, 863 (1861): "Mental pain or anxiety the law cannot value, and does not redress, when the unlawful act complained of causes that alone."

In Pennsylvania the denial of recovery for psychic injury can be traced to three principal concerns: medical science's difficulty in proving causation, the danger of fraudulent or exaggerated claims, and the perception that recognition of such a cause of action would precipitate a flood of litigation. *See, e.g., Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (1970); *Huston v. Freemansburg Borough, supra; Ewing v. Pittsburgh C. & St. L. Ry. Co., supra.*

It was not until 1970 that this Court created a limited exception to the impact rule. In *Niederman v. Brodsky, supra,* we abandoned the requirement of physical impact as a precondition to recovery only where the plaintiff was in personal danger of physical impact from the negligent force and actually feared physical impact. This became known as the "zone of danger" theory. The *Niederman* Court, in dismissing the traditional concern that causation could not be scientifically established in mental distress cases in which there was no physical impact, stressed the great strides made by medical science since the formulation of the impact rule:

New equipment and research, improved education and diagnostic techniques, and an increased professional understanding of disease in general require us now to

give greater credit to medical evidence. Other jurisdictions have also recognized that this advancement in the medical arts should and could be legitimately reflected in changes in the legal field. See, *e.g., Battalla v. State*, 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729 (1961) ("We must ... rely to an extent on the contemporary sophistication of the medical profession"); *Robb v. Pennsylvania Railroad Company*, 210 A.2d 709, 712 (Del.1965) ("the early difficulty in tracing a resulting injury back through fright or nervous shock has been minimized by the advance of medical science"). Finally, The American Law Institute through a deletion of a caveat from one of its comments, has expressed a similar view.

*Id.*, 436 Pa. at 406, 261 A.2d at 86 (footnotes omitted). The Court also concluded that the danger of fraudulent claims and the likelihood of a flood of litigation should no longer be considered legitimate grounds for barring bystander recovery.

More recently, in *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979), this Court was presented with the question of whether to permit recovery for emotional distress by a plaintiff who, while outside the zone of danger, actually witnessed an accident causing serious injury to a close relative. We recognized that the *Niederman* test was unduly restrictive in such a situation because its application would bar recovery even though the emotional impact was most probably produced by the event witnessed. In addition to the objections rejected in *Niederman*, we discussed two other policy considerations crucial to our determination: first, whether permitting recovery would present a problem of unlimited or unduly burdensome liability, and, second, whether it was possible to reasonably circumscribe the area of liability. In addressing the first question, we emphasized that the underlying duty of care would not be expanded, only the scope of damages recoverable. This Court also endorsed an objective standard for the recovery of damages which limited recovery for serious mental distress to situations where a reasonable person normally constituted would be unable to

adequately cope with the mental stress engendered by the circumstances of the event. *Id.*, 486 Pa. at 168, 404 A.2d at 683. As to the question of the area of liability, we found that three factors should determine whether the injury to the plaintiff was reasonably foreseeable:

> (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Id.*, 486 Pa. at 170–171, 404 A.2d at 685, *quoting Dillon v. Legg*, 68 Cal.2d 728, 740–741, 69 Cal.Rptr. 72, 80, 441 P.2d 912, 920 (1968).

We concluded that neither the nature of the damage alleged nor the extent of exposure to liability justified the denial of recovery on grounds of public policy.

In *Mazzagatti v. Everingham*, 512 Pa. 266, 516 A.2d 672 (1986), this Court declined to create a further exception in the case of a close relative who is not present at the accident scene but instead learns of the accident from a third party. We reasoned that prior knowledge of the accident serves as a buffer against the full impact of observing the accident scene and that the emotional distress thus results more from the emotional makeup of the observer than from the nature of the defendant's actions.

While concerns over proof of causation were found to be unjustified in the area of bystander recovery for emotional distress, the same cannot be said of the tort defined by section 46 of the Second Restatement and its Comments.

The species of tort created[5] by section 46 provides only the most nebulous definition of "outrageous" conduct. This

---

**5.** It is interesting to note that this tort is not truly a judicial development simply "restated" by the American Law Institute. "Although it relies on prior cases, the *Restatement* in this area has generated the

in turn renders the cause of action one which tends to defy principled adjudication. As one commentator has perceptively stated:

> The tort of intentional infliction of emotional distress by outrageous conduct differs from traditional intentional torts in an important respect: it provides no clear definition of the prohibited conduct.

> Battery, assault, and false imprisonment describe specific forms of behavior; while we can quibble about whether a kick in the playground should be attended with the same legal consequences as a kick in the classroom, everyone can agree that you cannot have a battery without physical contact (or an assault without at least the appearance of attempted physical contact, or a false imprisonment without restraint of the freedom of movement). The relative ease with which injury may be established is counter balanced by the specificity of the prohibited behavior.

> The term "outrageous" is neither value-free nor exacting. It does not objectively describe an act or series of acts; rather, it represents an evaluation of behavior. The concept thus fails to provide clear guidance either to those whose conduct it purports to regulate, or to those who must evaluate that conduct. The *Restatement* tells us that what is prohibited is conduct that is

> > so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member

law more than it has restated it." Theis, *The Intentional Infliction of Emotional Distress: A Need for Limits on Liability,* 27 DePaul L.Rev. 275, 276 (1977). "Academics, rather than courts, were the prime movers in the development of the tort of intentional infliction of severe emotional distress by outrageous conduct: the modern tort was introduced in the pages of law reviews, and then refined and finally defined by the American Law Institute in its *Restatements.*" Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct,* 82 Colum.L.Rev. 42 (1982) (footnote omitted).

of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

This is a strange description of a rule of law. Those situations in which "average members of the community" are up in arms over the outrageous conduct of individuals are situations in which the evenhanded application of law is threatened. A central goal of due process is to ensure that individuals are not judged by the "passion and prejudice of the moment," but are rather evaluated by rules of universal applicability, fairly and evenhandedly applied. to suggest, as the *Restatement* does, that civil liability should turn on the resentments of the average member of the community appears to turn the passions of the moment into law.

. . . .

The outrageousness test presents the related difficulty that recovery often depends, at least in the first instance, upon a court's determination that the defendant behaved in an immoral and uncivilized fashion. Yet, despite claims that they serve as "society's conscience," courts may have no particular wisdom with respect to what is socially intolerable. The court's gatekeeping task is hardly aided by the *Restatement's* glib assurance that the tort covers only those cases that are so extreme that people are literally aroused to proclaim "outrageous." The authors of the *Restatement* apparently felt that it was like hard-core obscenity in that judges would know it when they saw it. The reality is a great deal more complex. Courts cannot simply take refuge in their view of public sentiment when they face issues of outrageousness. First, there may be no community sentiment with respect to a vast number of issues, and whatever sentiment there is may be deeply divided with respect to other issues. It would indeed be surprising to learn that the business "community" shared the same views as the consumer "community" with respect to collection practices, or that employers and employees agreed about the employer's freedom of action to terminate "at will" an employee. Second, there are situations in which it literally does not

matter what dominant community sentiment may be—courts are not polling agencies, they are expositors of social policy.

Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct*, 82 Colum.L.Rev. 42, 52–53 (1982) (hereinafter *"Givelber"*).

The subjectiveness of the Restatement's concept of "outrageousness" is exacerbated by the fact that a finding of "outrageous" conduct on the part of the defendant may be, in effect, dispositive on the issue of damages. At first blush, the tort would appear to impose a heavy burden on the plaintiff; however, proof of "outrageous" conduct alone has been shown to be sufficient to sustain a plaintiff's case:

> [T]he tort, despite its apparent abundance of elements, in practice tends to reduce to a single element—the outrageousness of the defendant's conduct. This blurring of the distinction between plaintiff's injury and defendant's behavior is typical of intentional torts. Yet this is a most atypical intentional tort since it fails to define the proscribed conduct beyond suggesting that it is very bad indeed.

*Givelber* at 42–43.

 It is basic to tort law that an injury is an element to be proven. Given the advanced state of medical science, it is unwise and unnecessary to permit recovery to be predicated on an inference based on the defendant's "outrageousness" without expert medical confirmation that the plaintiff actually suffered the claimed distress. Moreover, the requirement of some objective proof of severe emotional distress will not present an unsurmountable obstacle to recovery. Those truly damaged should have little difficulty in procuring reliable testimony as to the nature and extent of their injuries. We therefore conclude that if section 46 of the Restatement is to be accepted in this Commonwealth, at the very least, existence of the alleged emotional distress must be supported by competent medical evidence. In this case no such evidence was presented and the record further

reflects that neither Mr. nor Mrs. Kazatsky sought medical assistance.

Accordingly, for the foregoing reasons, the order of the Superior Court sustaining the ruling of the trial court is affirmed.

LARSEN, HUTCHINSON and PAPADAKOS JJ., file concurring opinions.

## CONCURRING OPINION

LARSEN, Justice, concurring.

To paraphrase Shakespeare—the majority doth protest too much, methinks. To measure appellants' cause of action according to the standards set forth in section 46 of the Restatement (Second) of Torts and to purport to establish what evidence is required to prove an injury pursuant to section 46 is to adopt section 46 in this jurisdiction, in spite of what the majority states to the contrary.

I join the concurring opinion of Mr. Justice Papadakos to the extent that I would also expressly adopt section 46 today, but I write separately because I believe that the majority has by implication adopted section 46 in this case. The elements of this tort *are* difficult to define, and appellate courts delineate their parameters on a case-by-case basis as the majority has done in the instant case. *See* Annot., *Modern Status of Intentional Infliction of Mental Distress as Independent Tort; "Outrage"*, 38 A.L.R.4th 998 (1985). Additionally, although I agree that the Kazatskys, appellants herein, did not prove an essential element of their case, i.e., severe emotional distress, I object to the majority's adoption of a per se rule requiring "competent medical evidence" to prove severe emotional distress in *all* cases.

The respective functions of court and jury on the issue of "outrageous conduct" are as follows:

It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. *Where reasonable*

*men may differ*, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

Restatement (Second) of Torts § 46 comment h (emphasis added).

In *Forster v. Manchester*, 410 Pa. 192, 200, 189 A.2d 147, 152 (1963), this Court described outrageous conduct as being comprised of "acts of an especially flagrant character." Similarly, comment 2 to § 46 of the Restatement (Second) of Torts states that:

Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

The standard is high to prevent recourse to the courts in instances of mere bad manners, "insult, indignity, annoyance or even threats where the case is lacking in other circumstances of aggravation." Prosser, *Law of Torts*, § 12 Infliction of Mental Distress at 54 (4th Ed.1971).

Emotional distress is described as "fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea." Restatement (Second) of Torts § 46, comment j. Such emotional responses predate the advent of psychiatry and can readily be established without the testimony of one learned in that area of medical science. In spite of the wide acceptance of psychiatry today as a method of "curing" psychic ills, not every individual who is inflicted with such injury will turn to a psychiatrist or other doctor for treatment. To force such individuals to do so for purposes of proving distress, may be, in some instances, to compound their distress. I would also note that when distress is "parasitic" to physical injuries in negligence cases, medical evidence is rarely adduced at trial to prove that distress.

In using Givelber's commentary concerning the "blurring of the distinction between plaintiff's injury and defendant's

behavior", maj. op. at 197, to support a medical evidence standard, the majority loses sight of the difference between negligently inflicted injury and intentionally caused harm. An intentional act, as opposed to a negligent act, gives the injured party's claim an added element of reliability in that extreme and outrageous conduct ordinarily produces stress in normally constituted persons, *and such conduct is intended to produce stress.* Although a plaintiff must prove *both* outrageous conduct and severe emotional distress under section 46 to recover damages for injuries, it is obvious that the level of proof required with respect to distress will vary in individual cases as the degree of outrageousness of the tortious conduct varies.

Conduct that deserves the label "outrageous" is outrageous precisely because it tends to produce distress in normally constituted persons. The greater the outrage, the less proof will be required of a plaintiff to establish severe distress in that the distress can be inferred from the nature of the outrageous conduct. If A tortures and murders B's child in B's presence, the testimony of B as to his or her distress would suffice as proof of severe distress.[1] For this Court to require medical evidence, *whenever* a tortfeasor has produced such distress, is shortsighted.

### CONCURRING OPINION

HUTCHINSON, Justice, concurring.

I concur in the result. I do not believe the new intentional tort proposed by Section 46 of Restatement of Torts 2d,

---

1. Dean Prosser noted that section 46 of the Restatement of Torts was amended to reject any absolute necessity for physical results, and, commenting upon the relationship between the conduct and the distress, he stated:

 Probably the conclusion to be reached is that where physical harm is lacking the courts will properly tend to look for more in the way of extreme outrage as an assurance that the mental disturbance claimed is not fictitious; but that if the enormity of the outrage itself carries conviction that there has in fact been severe and serious mental distress, which is neither feigned nor trivial, bodily harm is not required.

 Prosser, *Law of Torts* § 12 Infliction of Mental Distress at 60 (4th Ed.1971).

with its undefined parameters, has any place in either Pennsylvania precedent or policy.

## CONCURRING OPINION

PAPADAKOS, Justice, concurring.

I concur in the result reached by the majority because I do not find the conduct of Appellee's owners, agents or employees to have been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Nor is there any evidence of physical or emotional *harm* done to Appellants. I believe both elements must be established to support a claim for damages for intentional infliction of severe emotional distress by outrageous conduct. Because I believe that the language of Section 46 of the Restatement of Torts is most appropriate for our needs in Pennsylvania, I have no hesitancy in adopting section 46 as the law in Pennsylvania. Although the majority correctly determines that section 46 is unnecessary for a proper disposition in this case, I find no reason why we cannot announce the adoption of section 46 as the law in Pennsylvania and lay to rest the confusion that obviously exists.