Sandra **LANDMESSER**, Plaintiff,

v.

**UNITED AIR LINES, INC.,** Defendant.

**No. Civ.A. 99–96.**

United States District Court,
E.D. Pennsylvania.

June 26, 2000.

Thomas F. Sacchetta, Media, PA, for plaintiff.

Michael S. Blume, Philadelphia, PA, for defendant.

## MEMORANDUM

LOWELL A. REED, Jr., Senior District Judge.

Plaintiff Sandra Landmesser ("Landmesser") brought this action alleging that she was wrongfully discharged by defendant United Air Lines, Inc. ("United"), in violation of Pennsylvania's public policy exception to the doctrine of at-will employment. She also asserts claims for breach of contract, breach of a covenant of good faith and fair dealing, and for intentional infliction of emotional distress. Now before the Court is the motion of the defendant United Air Lines, Inc., for summary judgment (Document No. 12).[1] For the reasons set forth below, the motion of United will be granted.

## I BACKGROUND

In 1990, Landmesser started working for United as a customer service representative and was generally considered a good employee. (Motion of United, Ex. 1, Deposition of Sandra Landmesser, at 33–37) ("Pl.'s Dep."); (Motion of United, Ex. 10, Customer Services Representative/Service Director Performance Review). On October 3, 1996, plaintiff came under suspicion for three separate ticketing improprieties, including an advance seat blocking she performed for herself.[2] United considers advance seat-blockings improper when performed by employees for their own travel convenience.[3] Alerted to something improper, Ms. Applegate reported her findings to Christine Rice, an acting supervisor, who brought the matter to the attention of Dick Sommer, another United supervisor. (Applegate Decl. at ¶ 8); (Motion of United, Ex. 12, Deposition of Rich-

1. Jurisdiction is proper pursuant to 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds $75,000.

2. United employee Jennifer Applegate was performing her duties as a passenger planner, reviewing the passenger lists for the following day, when she noticed that seven premium exit row seats had been assigned to passengers by the last name of "Zeccavette" on a flight to Los Angeles (Flight 95). (Motion of United, Ex. 11, Declaration of J. Applegate at ¶ 3) ("Applegate Decl."). Ms. Applegate attempted to examine records for the Zeccavette party but observed that a passenger name record for the members of that particular party did not exist and that there were no reservations in the system for the Zeccavette passengers. (Applegate Decl. at ¶ 4.) Trying to find out more information about the history of these seats, Ms. Applegate noted that plaintiff had forced a non-existent party under the name Zeccavette onto the flight and into those particular seats. (Applegate Decl. at ¶ 5.) Ms. Applegate remembered that plaintiff was traveling to Los Angeles with friends and family the next day, and she started to suspect that plaintiff had blocked the premium seats to ensure that she and her travel companions would be able to sit together.

3. While United employees and their relatives may travel on any United flight, they can do so only on a space-available basis. United contends that by blocking the seats ahead of time, plaintiff "denied a premium row of coach seats to revenue customers." (Motion of United, Ex. 17(B), Letter of John Watson to Sandra Landmesser) ("Watson Letter.")

ard Sommer, at 15–16) ("Sommer Dep."). Mr. Sommer contacted Corporate Security at United's headquarters in Chicago, and that department initiated an investigation of the incident. (Sommer Dep., at 16; Motion of United, Ex. 13, Declaration of Cindy Mulligan at ¶ 5 ("Mulligan Decl.")).

Cindy Mulligan of United's Corporate Security Department in Chicago examined several months of plaintiff's recent ticketing transactions and found that, in addition to blocking premium seats on Flight 95, plaintiff had engaged in other improper activities. Plaintiff had "even exchanged" a restricted, non-refundable 14–day advance purchase round trip ticket, bought by her cousin, for two one-way unrestricted tickets in the same direction and had waived the advance purchase requirements associated with 21–day advance purchase tickets for two other cousins. (Mulligan Decl. at ¶ 6b).

Plaintiff was present at an initial fact-finding meeting where she was given an opportunity to explain the suspicious transactions. (Pl.'s Dep., at 149; Motion of United, Ex. 14, Fact Finding Meeting for Sandra Landmesser, at 1–2 ("Fact Finding")). After that meeting, plaintiff

was informed that she was being suspended without pay until a more formal hearing could be conducted by United's City Manager, the highest ranked management official in Philadelphia. (Sommer Dep., at 55; Fact Finding, at 2). Plaintiff was then afforded three separate opportunities to defend herself against the allegations of wrongdoing, with the assistance of her attorney.[4] Following those hearings, plaintiff was terminated from her employment with United.

Having exhausted all remedies within United's internal grievance process, plaintiff brought this action in the Court of Common Pleas in Philadelphia County, and the case was removed to this Court.

## II ANALYSIS

Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, summary judgment may be granted when, "after considering the record evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Turner v.*

---

**4.** A hearing with John Watson, the City Manager, was held on November 22, 1996, and plaintiff did not deny performing any of the transactions detailed above. (Motion of United, Ex. 17, Declaration of J. Watson at ¶ 7) ("Watson Decl."); Pl.'s Dep. at 109, 125–26, 138–42. Shortly after that hearing, Mr. Watson informed plaintiff that her employment with United was terminated. (Watson Decl. at ¶ 8; Watson Letter, at 4). Plaintiff appealed Mr. Watson's decision through United's internal appeals process, (Pl.'s Dep., at 154–55), and was entitled to bring forth witnesses to present evidence on her behalf. Plaintiff brought in three co-workers to confirm that "everyone" engaged in the sorts of transactions for which she had been fired. The co-workers, all testified that plaintiff had not done anything out of the usual by blocking seats, "even exchanging" a ticket, and waiving an advance 21 day purchase requirement. However, these witnesses could not name specific Philadelphia employees who had conducted similar transactions, under similar circumstances. (Motion of United, Ex. 18, Letter of Joe Longbottom to Sandra Landmesser,

at 3 ("Longbottom Letter"); Motion of United, Ex. 15, Deposition of K. Kafel, at 48, 78–80, 93–94; Motion of United, Ex. 19, Deposition of J. Lombardo, at 110–11, 127–28, 142–43; Motion of United, Ex. 20, Deposition of D. Horchak, at 43, 54–55). Furthermore, in response to plaintiff's allegations that "everyone" waived advance purchase fees and even-exchanged restricted tickets, Cindy Mulligan of United's Corporate Security Department, conducted a random sample of computer transactions generated by Philadelphia employees to determine whether such practices were pervasive. Her audit did not uncover any activity similar to that engaged in by plaintiff, (Mulligan Decl. at ¶ 7), and Mr. Watson's decision to terminate plaintiff was affirmed. Plaintiff was given the opportunity to further appeal, and United flew her to Chicago headquarters where she presented her case with the help of her attorney. (Pl.'s Dep., at 164). The panel rendered a final decision affirming plaintiff's termination. (Motion of United, Ex. 21, Letter of J. Hartigan & S. Gilday, at 4).

*Schering–Plough Corp.,* 901 F.2d 335, 340 (3d Cir.1990). For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party establishes the absence of a genuine issue of a material fact, the burden shifts to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson* 477 U.S. at 248–49, 106 S.Ct. 2505. The non-moving party may not rely merely upon bare assertions, conclusory allegations, or suspicions. *See Fireman's Ins. Co. v. Du Fresne,* 676 F.2d 965, 969 (3d Cir.1982).

### A. Wrongful Discharge

Pennsylvania has long adhered to the doctrine of at-will employment under which an employer "may discharge an employee with or without cause, at pleasure, unless restrained by some contract." *Henry v. Pittsburgh & Lake Erie R.R. Co.,* 139 Pa. 289, 297, 21 A. 157 (1891); *see also Clark v. Modern Group Ltd.,* 9 F.3d 321, 327 (3d Cir.1993) (quoting *Nix v. Temple*

*Univ.,* 408 Pa.Super. 369, 375, 596 A.2d 1132, 1135 (1991) (holding that the core of the at-will doctrine is that an employee "can be terminated for good reason, bad reason, or no reason at all")); *Geary v. United States Steel Corp.,* 456 Pa. 171, 175, 319 A.2d 174, 176 (1974) (stating that unless there is an explicit statutory or contractual provision to the contrary, "the law has taken for granted the power of either party to terminate an employment relationship for any or no reason.")

Despite the fact that United needs no reason to fire plaintiff, it has produced ample evidence of plaintiff's wrongdoings with respect to ticketing practices, and I conclude that plaintiff has not produced evidence sufficient to create a genuine issue of material fact that as to whether her transactions were violative of United's policies. In fact, plaintiff has not denied performing the contested transactions and even concedes that she understands why United would deem them improper. (Pl.'s Dep., at 109, 136–42, 146).[5] Rather, plaintiff claims that United's focus on the wrongful ticketing transactions is merely pretextual, and that the true reason for her discharge was her application for workers' compensation benefits in June of 1994,[6] a retaliatory motive that would vio-

---

**5.** Plaintiff does not dispute that she blocked seats on Flight 95 and admits that she was "not entitled to a confirmed seat." (Pl.'s Dep., at 112). Plaintiff also does not dispute that she performed the two ticketing transactions for her cousins which United deemed improper. (Pl.'s Dep., at 129–32, 142–47.)

**6.** On June 1, 1994 plaintiff was working baggage check-in when she lifted a heavy suitcase, tripped on the frayed carpeting, lost her balance, and fell unto a moving conveyor belt. (Pl.'s Dep., at 61–62). Plaintiff immediately sought medical care and was told she had a fractured left wrist, bruised ribs, and a sprain to her left knee. (Pl.'s Dep., at 62–63). Although she returned to work after approximately eight to ten days, it soon became apparent that her injuries were more extensive than originally thought and required surgery and other intensive treatment. The sprain to plaintiff's knee turned out to be a medial meniscus tear, and she was ordered to stay

out of work until surgery could be performed. Plaintiff was scheduled to go back to work six to eight weeks after the surgery, but plaintiff's fractured hand was not healing. Tests revealed that a cyst was growing in the fractured area, and that cyst was aspirated several times. When that technique failed, plaintiff opted for surgical removal of the cyst. The surgery took place in January of 1995, but because of torn ligaments in her wrist, plaintiff's bones had to be wired together. Scar tissue resulting from that surgery further impeded the healing and restricted plaintiff's range of motion. On the advice of her physicians, plaintiff did not return to work until she was cleared to do so on a light duty basis in July of 1995, approximately one year after the injury occurred. (Pl.'s Dep., at 74–75). From June 2, 1994 through July 31, 1995, the period of time during which her injuries prevented her from working, plaintiff received workers' compensation which amounted to 100% of her pre-injury salary. (Motion of

late Pennsylvania's public policy exception to the at-will employment doctrine. (Pl.'s Brief, at 5).

Since 1974, the Supreme Court of Pennsylvania has recognized a cause of action for wrongful discharge under circumstances that violate public policy. *See Geary v. United States Steel Corp.*, 456 Pa. 171, 184, 319 A.2d 174, 180 (1974) ("[T]here are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened.") In the years following *Geary*, the Superior Court of Pennsylvania identified a number of instances that would violate public policy and give rise to a cause of action for wrongful discharge. *See Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978) (termination for absence due to jury duty violates public policy); *Hunter v. Port Auth. of Allegheny County*, 277 Pa.Super. 4, 419 A.2d 631 (1980) (denial of employment to pardoned individual because of an assault conviction violates public policy); *Field v. Philadelphia Elec. Co.*, 388 Pa.Super. 400, 565 A.2d 1170 (1989) (discharge for making statutorily required report to the Nuclear Regulatory Commission violates public policy.)

Recently, in *Shick v. Shirey Lumber*, 552 Pa. 590, 592, 716 A.2d 1231, 1232 (1998), the Supreme Court of Pennsylvania explicitly recognized another instance in which a discharge would violate public policy: "We hold that an at-will employee who alleges retaliatory discharge for the filing of a workers' compensation claim has stated a cause of action for which relief may be granted under the law of this Commonwealth." *Shick v. Shirey*, 552 Pa. at 592,

716 A.2d 1231. While *Shick* unambiguously recognizes a cause of action when an employee is terminated in retaliation for filing a workers' compensation claim, the Supreme Court did not define the elements necessary to establish a *prima facie* case of "retaliation." Other judges in this district have struggled with this lack of guidance. *See Alderfer v. Nibco Inc.*, 1999 U.S.Dist. LEXIS 16083, at *3, 1999 WL 956375 (E.D.Pa. Oct. 19, 1999) (finding that there is a "dearth of caselaw" interpreting *Shick*, and that the Pennsylvania courts have not set forth a "model of proof to use in evaluating claims"); *see also Sharkey v. Federal Express Corp.*, 2000 U.S.Dist. LEXIS 2041, at *16–17, 2000 WL 230330 (E.D.Pa. Feb. 29, 2000) (positing that the plaintiff must present "affirmative evidence" of retaliation and may not defeat motion for summary judgment by merely averring "unsupported allegations") (citation omitted).

When a district court faces issues of state law that have not been directly addressed by the state supreme court, the court must predict how the state supreme court "would resolve these issues should it be called upon to do so." *Wiley v. State Farm Fire & Casualty Co.*, 995 F.2d 457, 459 (3d Cir.1993) (citing *Robertson v. Allied Signal Inc.*, 914 F.2d 360, 378 (3d Cir.1990)) citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 82, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). I conclude that the Supreme Court of Pennsylvania has not ruled on this issue of law and that when it does, it will adopt the analysis that is already applied in retaliation cases in the federal employment context.[7] In order to advance a *prima facie* case of retaliation in the Title VII context, a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer

---

United, Ex. 6, Notice of Compensation Payable and Supplemental Agreement to Compensation, at 1–2).

7. To some extent, the Sharkey Court has already made this prediction without stating so explicitly. In order to accomplish its analy-

sis, that court adopted the Title VII analysis for retaliation which it termed "a comparable framework" to the cause of action available under *Shick v. Shirey*. *Sharkey*, 2000 U.S.Dist. LEXIS 2041, at *17, 2000 WL 230330.

took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir.2000) (citations omitted).

■ Applying this analysis to the instant case, it is clear that the first two elements of a *prima facie* case have been met: the plaintiff engaged in a protected activity as defined under *Shick*, and the employer took the adverse action of terminating her after she had engaged in that protected activity. As to the third element, however, plaintiff has advanced only speculation as to the nexus between her protected activity and the discharge, and I conclude that no reasonable jury could find a causal connection based on such speculation. Plaintiff asserts that "everyone" engaged in the type of improprieties she was accused of, thereby implying that United's termination of her was discriminatory. However, even when viewing all the facts in the light most favorable to the plaintiff, I conclude that there is simply not enough evidence to create a genuine issue of material fact as to a causal connection between the workers' compensation benefits and the termination.

As evidence of a retaliatory motive on United's part, plaintiff relies primarily on a comment that was made about her post-injury physical ability by K.C. Dawe, a United supervisor. In her deposition, plaintiff testified: "I know for a fact that K.C. Dawe has said he is sick of people complaining about me, how they have to shut my doors, how they have to sling my bags, how they have to basically carry my

weight...." (Pl's Dep., at 170). Plaintiff here conflates a claim for discharge due to disability with a claim for discharge in response to her prior application for workers' compensation.[8] At most, this comment reveals the supervisor's general frustration at plaintiff's inability to perform all the tasks regularly associated with her position. In no way would this comment support a reasonable jury finding that plaintiff was discharged in retaliation for an application for workers' compensation benefits. A plaintiff must produce at least *some* evidence that connects the dots between her claim for workers' compensation and her termination, such as adverse personnel action promptly after her workers' compensation claim was made, statements by supervisors referencing her claim, documents from the employer discussing her claim with respect to her termination, etc... Plaintiff has produced no such evidence here.

Plaintiff also claims that her diminished physical ability earned her special treatment that made her co-workers jealous. She alleges that envy for her lighter workload prompted Jennifer Applegate's investigation of her ticketing transactions, and states that Ms. Applegate "admitted that she did not like the Plaintiff and was one of the individuals who had animosity toward Plaintiff because she was in a modified position." (Pl.'s Brief, at 2). This "admission" is nowhere to be found in the record before the Court and plaintiff's brief does not cite to any part of the record to substantiate this claim. Furthermore, there is no evidence that Ms. Applegate's investigation was flawed or its results skewed by an attitude toward the plaintiff. While the Court is duty bound to view all facts in the light most favorable to

---

**8.** Plaintiff herself characterized that comment as critical of her lack of physical ability: "Because I don't think they terminated me for any reason or for no reason other than my disability and the tension that it caused." (Pl.'s Dep., at 170.) It is also significant to note that, upon her return to work, United made efforts to ensure that plaintiff would be placed in a work environment which she could handle with her physical limitations and that it was the plaintiff herself who asked to be reinstated to the more physically taxing positions she had occupied prior to her injury. (Pl.'s Dep., at 81–82.) While plaintiff's brief alleges that she asked to be moved from her duty because "she was having problems standing," (Pl.'s Brief, at 2), there is no such evidence anywhere in the record.

the non-moving party, mere speculation is not accorded deference. *See Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989) (explaining that summary judgment is warranted when the evidence is so one-sided that one party must prevail as a matter of law). Further, even if Ms. Applegate's investigation was prompted by jealousy, plaintiff has failed to show how one co-workers' animosity becomes synonymous with a retaliatory company policy, and I conclude that no reasonable jury could find that Ms. Applegate's "unauthorized" investigation amounts to retaliation on United's part for a workers' compensation claim.[9]

Having reviewed all of the evidence, I conclude that no reasonable jury could find a causal link in this record between the protected activity and the termination. The mere fact that "the discharge occurred after plaintiff filed for benefits does not constitute evidence of retaliation based on the *post hoc ergo propter hoc* reasoning." *Alexander v. Red Star Express Lines, Inc.,* 646 F.Supp. 672, 681 (E.D.Pa. 1986) (citations omitted), *aff'd,* 813 F.2d 396 (3d Cir.1987).[10] In the absence of any evidence connecting plaintiff's workers' compensation claim with her discharge, I conclude that no reasonable jury could find for the plaintiff on the claim of retaliatory discharge and that defendant is entitled to summary judgment as a matter of law.

## B. Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

Plaintiff asserts a breach of contract claim, arguing that the policies and procedures detailed in United's employee handbook constitute a contract and that United breached that contract by bringing false allegations of wrongdoing against the plaintiff in violation of the duty of managers to be "fair, objective, and non-vindictive." (Compl. at ¶¶ 26, 28). In addition, plaintiff argues that United breached its covenant of good faith and fair dealing "by failing and refusing to provide plaintiff with documents and other material necessary for plaintiff's appeal" and that United "failed to take into consideration certain documents provided by plaintiff which would have supported her appeal." (Compl. at ¶ 20.)

9. Plaintiff also claims that it was management itself that orchestrated her demise by circulating rumors about her and by actively trying to find some reason to fire her. (Pl.'s Dep., at 171–72). However, plaintiff cannot offer any specifics about the methods or rumors management used to achieve its goals: "I don't even know. You walk into a room, and five people stop talking. And later on, someone will say, 'Yeah, so and so said, I hear they're trying to get rid of you now.'" (Pl's Dep., at 172–73). Even construed in the most favorable light, these statements simply do not provide enough evidence for a reasonable jury to find a causal connection between the application for workers' compensation and the termination.

10. "[T]emporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive.'" *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280 (3d Cir.2000) (citing *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503 (3d Cir.1997)). In *Krouse,* the court affirmed that 19 months was too long a time period between the protected activity and the discharge to create a genuine issue of

fact absent some other evidence of retaliation. *Krouse* 126 F.3d, at 503. However, prompt action to fire an employee after that employee engages in a protected activity may be deemed sufficient to establish a causal link, *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989) (holding that the discharge of an employee just two days after filing discrimination claims established a causal link). Similarly, failure to fire an employee immediately after he or she engages in the protected activity does not automatically mean that the two are not linked. *See Robinson v. Southeastern Pa. Transp. Auth.,* 982 F.2d 892, 894 (3d Cir. 1993) (holding that "[t]he mere passage of time is not legally conclusive proof against retaliation"). In the instant case, plaintiff has offered no evidence of retaliation other than the inferences that can be drawn from the temporal sequence of events. The initial investigation into plaintiff's alleged wrongdoings was launched 15 months after her return to work and 28 months after her application for workers' compensation benefits. This timing does not seem "unusually suggestive."

■ I conclude that plaintiff has not provided any evidence to create a genuine issue of material fact. As has been held by this very Court, "An employee handbook or manual only forms the basis of an implied contract if the employee shows that the employer affirmatively intended that it do so." *Mercante v. Preston Trucking Co.*, 1997 U.S.Dist. LEXIS 7453, at *6–7, 1997 WL 288614 (E.D.Pa. May 21, 1997) (citations omitted). Plaintiff has advanced no evidence that United intended for the employee handbook to form the basis of a contract. To the contrary, United's handbook contains an unambiguous disclaimer: "These regulations do not constitute an employment contract between United Airlines, Inc., and its employees .... [b]oth the company and the employee retain the right to end the employment relationship at any time, with or without cause and with or without notice." (Motion of United, Ex. 5, United Handbook Series 15). This explicit disclaimer of the formation of a contract nullifies plaintiff's claim for breach of contract. *See Ruzicki v. Catholic Cemeteries Ass'n of Diocese of Pittsburgh*, 416 Pa.Super. 37, 42, 610 A.2d 495, 498 (1992) ("Given the explicit disclaimer stating that the handbook does not effect an employee's at-will status, ... [the plaintiff] faces an insurmountable burden in arguing that the handbook converts him from an at-will employee to one who can only be fired through the use of progressive discipline as articulated in the handbook."); *see also Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 660 (3d Cir. 1990) (*citing Veno v. Meredith*, 357 Pa.Super. 85, 99, 515 A.2d 571, 578 (1986)) ("the modification of an 'at-will' relationship to one that can never be severed without 'just cause' is such a substantial modification that a very clear statement of an intention to so modify is required"); *Martin v. Capital Cities Media, Inc.*, 354 Pa.Super. 199, 218–220, 511 A.2d 830, 840–41 (1986) (holding that an employee handbook does not alter the presumption of at-will employment unless handbook contains specific language to that effect). Because plaintiff has not established a genuine issue of material fact as to whether the employee handbook constituted a contract, defendant is entitled to summary judgment as a matter of law on plaintiff's breach of contract claim.

■ Plaintiff's claim for breach of a covenant of good faith and fair dealing also fails. Under Pennsylvania law, "there is no cause of action for breach of the implied covenant of good faith and fair dealing when the employment relationship is at-will...." *Brennan v. National Tel. Directory Corp.*, 850 F.Supp. 331, 346 (E.D.Pa. 1994); *see also McGrenaghan v. St. Denis Sch.*, 979 F.Supp. 323, 328 (E.D.Pa.1997) (finding that there is no "independent action for breach of a duty of good faith and fair dealing"); *Mercante*, 1997 U.S.Dist. LEXIS 7453, at *12, 1997 WL 288614 ("This circuit does not recognize an implied covenant of good faith and fair dealing in the absence of a contract"). Because it has already been established that plaintiff was an at-will employee and that nothing in the handbook modified her position, she cannot sustain this cause of action and defendant is entitled to summary judgment as a matter of law.

## C. Intentional Infliction of Emotional Distress[11]

Plaintiff asserts that her termination caused her "severe emotional turmoil" and that the defendant's course of conduct was calculated to have a "severe and traumatic effect upon the plaintiff's emotional state." (Compl. at ¶ 33). Devoid of legal merit and unsubstantiated by evidence, this

---

11. Plaintiff's attorney repeatedly seeks relief for a cause of action entitled "intentional infliction of emotional stress." Having searched high and low for case law on such a tort and having found none, I will assume for the purposes of this opinion that counsel intended to seek relief for intentional infliction of emotional *distress,* and will rule accordingly.

claim must fail.[12] The standard for assessing conduct capable of inflicting emotional distress is not a subjective one: the conduct must be "extreme and outrageous" and must "intentionally or recklessly" cause another person "severe emotional distress." *Restatement (Second) of Torts,* § 46 (1965). In order for conduct to be considered "extreme or outrageous," it must go beyond "all possible bounds of decency," and must be regarded as "atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Restatement (Second) of Torts,* § 46 cmt. d.

■ In the instant case, plaintiff has advanced no evidence that would allow a reasonable jury to find that defendant's behavior was "extreme and outrageous." Even assuming that defendant terminated plaintiff in an extremely embarrassing way and circulated rumors about her and her alleged misconduct,[13] such behavior, while unfortunate, would not be outrageous. The plaintiff's case is very difficult to sustain, given that it is "extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395 (3d Cir.1988), *cert.* *denied,* 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990). Employment termination is often an unpleasant business, but the attending routine unpleasantness that can surround a termination does not elevate the termination to the level of outrageousness: "while loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event." *Brieck v. Harbison–Walker Refractories,* 624 F.Supp. 363, 367 (W.D.Pa. 1985), *aff'd. in relevant part,* 822 F.2d 52 (3d Cir.1987), *cert. dismissed,* 488 U.S. 226, 109 S.Ct. 546, 102 L.Ed.2d 512 (1988).

Even accepting all of plaintiff's allegations as true, I conclude that she has advanced no evidence of hardship above and beyond the hardship that is ordinarily to be expected when a job is lost. Human nature is such that gossip is to be expected when an employee is terminated and gossip can be counted as one of the "insults, indignities, threats, annoyances, petty oppressions, or other trivialities" that plaintiffs must expect to encounter. *Kazatsky,* 515 Pa. at 191, 527 A.2d 988 (quoting *Restatement (Second) of Torts,* § 46 cmt. d). There is no indication that the rumors circulating about the plaintiff were anything more than common-place water-cooler gossip, even if they were generated by her employer. As plaintiff herself stated: "When you work in a close environment with that many people ... the gossip is unbelievable...." (Pl.'s Dep., at 173).

**12.** In a recent decision, the Supreme Court of Pennsylvania balked at formally recognizing a cause of action for intentional infliction of emotional distress. *See Taylor v. Albert Einstein Med. Ctr.,* 2000 Pa. LEXIS 1206, at *6, 2000 WL 630999 (Pa. May 17, 2000). However, in that very decision, the Supreme Court has stated that, were it to recognize such a tort, it would pattern it after Section 46 of the Restatement (Second) of Torts, at least so far as the "minimum elements necessary to sustain such a cause of action." *Id.* Prior to this latest pronouncement, the Third Circuit, in *Williams v. Guzzardi,* 875 F.2d 46 (3d Cir. 1989) through its interpretation of *Kazatsky v. King David Mem'l Park, Inc.,* 515 Pa. 183, 527 A.2d 988 (1987), instructed district courts that they were to recognize the tort of intentional infliction of emotional distress until the Pennsylvania Supreme Court definitively decides the issue. *See Bullock v. Balis Co.,* 1999 U.S.Dist. LEXIS 11656, at *10 , 1999 WL 527792 (E.D.Pa. July 21, 1999) (citations omitted). For the purposes of this opinion, I will assume the tort exists and adopt the Supreme Court's latest formulation as to the elements it requires.

**13.** Plaintiff claims that United purposely generated and circulated all kinds of nasty rumors about her. She offers no evidence for this allegation but we accept it as true for purposes of this motion.

Furthermore, a mere assertion that plaintiff has suffered emotional distress as a result of defendant's actions will not suffice to establish the prima facie case for the tort. Pennsylvania requires that the plaintiff substantiate the claim that she feels distress, "a minimal element of the tort," with "competent medical evidence." *Kemp v. Philadelphia Housing Authority,* 1999 U.S.Dist. LEXIS 16130, at *3, 1999 WL 975121 (E.D.Pa. Oct. 5, 1999) (citing *Nowosad v. Villanova Univ.,* 1999 U.S.Dist. LEXIS 7319, 1999 WL 322486 (E.D.Pa. May 19, 1999)). Plaintiff admits that she has never seen a mental health professional to discuss her "severe emotional turmoil," (Pl.'s Dep., at 183), and can offer no evidence as to how the rumors and allegations have affected her emotional or psychological state. Thus, plaintiff cannot sustain the *prima facie* elements of a claim for intentional infliction of emotional distress and defendant is entitled to summary judgment as a matter of law.