Carlton E. LEWIS

v.

**DELAWARE COUNTY, et al.**

No. Civ.A. 95–CV–7418.

United States District Court,
E.D. Pennsylvania.

Aug. 23, 2000.

Donna E. Baker, Larry Pitt and Associates, Philadelphia, PA, for Plaintiff.

Robert M. Diorio, Diorio & Sereni, LLP, Media, PA, for Defendants.

## OPINION

POLLAK, District Judge.

On November 27, 1995, Corrections Officer Carlton E. Lewis filed this lawsuit against Delaware County, Delaware County Prison ("Delaware Prison"), the Delaware Prison's Board of Inspectors ("the Board"), and fourteen individuals.[1] The complaint alleged that each of these defendants committed: racial discrimination under 42 U.S.C. §§ 1981 and 1985; retaliation under 42 U.S.C. § 1983 and 43 Pa. Stat. § 1423 in response to Officer Lewis's having disclosed incidents of inmate abuse to the FBI; and intentional infliction of emotional distress. On March 10, 1999, defendants filed the motion for summary judgment addressed herein. Resolving all disputed issues of material fact in Officer Lewis's favor, we conclude that defendants' motion should be granted in part and denied in part. The structure of this opinion will be, first, to outline the facts of the case as alleged by the plaintiff; second, to examine the legal theories on which Officer Lewis asserts that the defendants are liable; and third, to decide which defendants could properly be held liable under each of these theories, assuming Officer Lewis can prove the facts alleged.

## I. Facts as Alleged:

This case concerns the reasons that Officer Lewis was formally sanctioned and, on June 1, 1995, dismissed from his post as a Delaware Prison corrections officer, where he had worked since November 4, 1991. Since a substantial part of Officer Lewis's lawsuit concerns his allegation that defendants disciplined him in retaliation for co-

1. These individuals are George Hill, Delaware Prison's Warden; Dominick F. Spigarelli and Richard DeAntoniis, Delaware Prison's two Assistant Wardens; Frank Green, Delaware Prison's Deputy Warden of Security; Albert Kulp, a Lieutenant at Delaware Prison; Charles Sexton, Elizabeth Signor, William Kelly, and John McKenna, members of the Board; Paul G. Mattus, Thomas H. Killion, Wallace H. Nunn, and John J. McFadden, members of the Delaware County Council; and Ward Williams, a member both of the Board and of the Delaware County Council.

operating with an FBI investigation, a brief account of the events underlying that cooperation seems appropriate.

On the night of May 28, 1994—during the "second shift," from 4:00 p.m. to midnight—Officer Lewis saw several corrections officers severely beat an inmate; Officer Lewis claims that the shift supervisor, Lieutenant Kulp, also witnessed the incident. Upset by his colleagues' brutality, Officer Lewis told Lieutenant Kulp that if anyone ever asked him what had happened, Officer Lewis would reveal both the correction officers' actions and Lieutenant Kulp's failure to intervene. A corporal on duty that night, Charles Cartwright, was assigned to draft an incident report for Lieutenant Kulp, and Corporal Cartwright ordered Officer Lewis to prepare a report as well. Neither document mentioned the officers' excessive use of force, allegedly because Corporal Cartwright bullied Officer Lewis into falsifying his account. On July 20, 1994, Officer Lewis witnessed correctional officers beating another inmate, and he decided to report both of these violent incidents to the FBI.

Based in part on Officer Lewis's information, the FBI began an extensive investigation into Delaware Prison. At that time, the FBI notified Warden Hill and Assistant Wardens Spigarelli and DeAntoniis that federal agents would be requesting personnel files of inmates and corrections officers, conducting on-site interviews with inmates, and preparing corrections officers for grand jury testimony. The details of the investigation, however—including the identities of suspects, victims, or possible informants—were not disclosed. Assistant Warden Spigarelli was designated chief liaison between the prison administration and the investigation, with some assistance from Assistant Warden DeAntoniis in locating personnel files. In fulfilling his assigned role, Assistant Warden Spigarelli circulated a memo requesting that any corrections officers who would miss part or all of their shift because of their cooperation with the FBI should inform him of that fact.

By November of 1994, rumors had begun to spread that some officers and staff, among whom Officer Lewis was occasionally named, were "snitching" on their prison colleagues by cooperating with the FBI. But Officer Lewis alleges that he did not suffer any harassment until May 11, 1995. On that day, Officer Lewis called Assistant Warden Spigarelli to say he would be late for his shift because the FBI was preparing him to present grand jury testimony. That phone call was allegedly the first time Officer Lewis had told anyone at the prison that he was cooperating with the investigation. When Officer Lewis returned to his prison shift for lunch, one of the corrections officers, John Peck, said he had to leave the officers' dining room because "the FBI snitch" had arrived. Officer Lewis asked Officer Peck why he was "after him all the time," to which Officer Peck responded with an obscenity, saying that no one liked Officer Lewis because he had "ratted on them." A short while later, as Officer Peck walked by Officer Lewis near some vending machines, he again insulted Officer Lewis and threatened to "blow his ... head off" if they ever encountered one another outside the prison. Officer Lewis immediately reported this physical threat to Lieutenant Kulp, who called both men into his office. Officers Lewis and Peck appeared to have reached some level of oral resolution, but Officer Lewis filed a written report that evening with Warden Hill and with the FBI, as the FBI had warned him to do if faced with a physical threat.

In response to Officer Lewis's report, Assistant Warden Spigarelli called the FBI to ask whether an internal inquiry into the incident concerning Officer Lewis might disturb the FBI's investigation. The FBI replied that the prison authorities should handle the affair themselves, and Assistant Warden Spigarelli wrote to Deputy Warden Green on May 12, 1995, ordering him to investigate the incident.

Deputy Warden Green's final report to Assistant Warden Spigarelli summarized statements from several corrections officers who were on duty that night, including Lieutenant Kulp, and concluded that there was no "apparent evidence" that Officer Peck had threatened Officer Lewis: "Rather it appears C.O. Lewis is perpetuating the problem through confrontation." The report, dated May 24, also noted that neither Officer Lewis nor Officer Peck had been interviewed in its preparation. On May 25, Assistant Warden Spigarelli replied, "After review, I concur with your assessment that C.O. Lewis has created and perpetuated this confrontation. Further I feel that disciplinary action is in order for C.O. Lewis."

After Assistant Wardens Spigarelli and DeAntoniis consulted with one another and with Warden Hill on May 25, Assistant Warden DeAntoniis summoned Officer Lewis to his office to declare that he was to be dismissed in accordance with Warden Hill's final decision. The proffered reason for Officer Lewis's release was the "progressive disciplinary system" embodied in Article X of the prison's collective bargaining agreement. This system prescribed that successive rules violations in the same year would incur increasingly severe disciplinary sanctions. Assistant Warden DeAntoniis explained that the incident with Officer Peck was Officer Lewis's third offense and that, therefore, dismissal was deemed to be the appropriate response.[2] According to Assistant Warden DeAntoniis, Officer Lewis's two preceding "write-ups" concerned a verbal altercation with a corrections officer on August 25, 1994 and an incident of his briefly taking his keys outside the prison upon leaving work on January 6, 1995.

Another significant component of Officer Lewis's suit concerns allegations of racial discrimination. Officer Lewis claims that he, a black man, was disciplined for having been the *target* of threats and insults while Officer Peck, a white man, was not disciplined for having been the threats' source. Also, Officer Lewis asserts that Warden Hill, Assistant Warden Spigarelli, and Deputy Warden Green had acquiesced in racial discrimination by having failed to respond to Officer Lewis's previous complaints regarding disparities in the allocation of vacation time and regarding Officer Lewis's alleged responsibility for an earlier dispute with a white corrections officer.

Officer Lewis was dismissed on June 1, 1995. Arbitration was sought to determine whether the dismissal was proper. On March 22, 1996, the arbitrator deemed Officer Lewis's discharge to have been unjustified: "[T]he entire matter should have been handled without invoking the formal disciplinary procedure. On the other hand, if the grievant was to be disciplined for his participation in the argument, Peck assuredly should have been, too. That he was not is evidence of disparate treatment that cannot stand." Arbitration Op. at 7–8. Furthermore, the arbitrator found that the May 26 citation against Officer Lewis was untimely because it violated the collective bargaining agreement's requirement that discipline be implemented within four days of the misconduct that gives rise to it. Collective Bargaining Agreement, Article X, Section 5.

## II. Theories of Liability:

### A. Illegal Retaliation

■ Officer Lewis alleges that defendants' decision to sanction and dismiss him

---

**2.** Specifically, the policy provides that: "[v]iolation ... will result in a written warning ... upon the occurrence of a first offense; a disciplinary suspension upon the happening of a second offense; and termination upon the happening of a third offense. In those situations where the offenses are unrelated, the discipline shall be as follows: (a) First Offense—Written Warning. (b) Second Offense—Written Warning. (c) Third Offense—

Suspension. (d) Fourth Offense —Discharge." It is unclear whether the termination in Officer Lewis's case would properly have required three or four successive violations. *Compare* DeAntoniis Depo. 56–57 (stating that Officer Lewis was terminated based on three infractions) *with* Arbitration Op. 8 (characterizing Officer Lewis's dismissal as necessarily requiring four citations).

was retaliatory, in violation of his First Amendment rights as protected by 42 U.S.C. § 1983 and his state law rights under Pennsylvania's Whistleblower Statute, 43 Pa.Stat. § 1423.

## 1. § 1983

With respect to the § 1983 claim, the Third Circuit has established a three-part test for liability. *See Green v. Philadelphia Housing Auth.,* 105 F.3d 882, 885 (3d Cir.1997):

(1) First, a plaintiff must show that the speech at issue was constitutionally protected, and in this case, defendants do not contest that Officer Lewis's decision to cooperate with the FBI was so protected. The topic of Officer Lewis's speech was clearly a matter of public concern—the alleged abuse of prison inmates—and the public interest at stake was not outweighed by any state interest in providing public services efficiently. *See id.* at 885 (citing *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Indeed, the state's interest in preventing Officer Lewis's speech seems especially limited in the present context because his communication was made confidentially and was directed to an authorized government investigative agency.

(2) Second, a plaintiff must show that the protected speech was a substantial or motivating factor in the alleged retaliation. Defendants assert that the prison's disciplinary system virtually required them to fire Officer Lewis; thus, they argue that the firing could not possibly have been motivated by a desire to retaliate. This argument's flaw, however, is its attention only to the decision to fire Officer Lewis rather than on the decision to sanction him. Nothing in the progressive disciplinary agreement required that Officer Lewis be "written up" in connection with the Officer Peck incident, and defendants do not dispute that a citation itself carries sufficient adverse consequences to constitute an act of illegal retaliation. Thus, the question of whether Officer Lewis's disciplinary citation was itself unconstitutional retaliation presents a disputed question of material fact.

Moreover, with respect to the subsequent decision to terminate Officer Lewis, parts of the testimony offered by Warden Hill and Assistant Wardens Spigarelli and DeAntoniis would support a fact-finder in drawing the inference that termination decisions under Delaware. Prison's disciplinary system were somewhat discretionary, even though such leniency was infrequently exercised. *See* Hill Depo. at 68 ("[A]t times when I would even maybe feel that I wanted to give somebody a break, I would be concerned about doing that ... simply because the next time ... the union would come right back ... you gave him a break, why can't you give this guy the same break.... So we stuck pretty much to the terms of the contract ...."); Spigarelli Depo. at 21 ("[A case] would go to the warden for review, and in every case that I've ever seen we sat down with the warden, he just didn't make an arbitrary determination from reports. He would ask questions, and we would sit and give him information from what we had, and then he would make a decision."); DeAntoniis Depo. at 35 ("[A computer printout] would tell them whether this was the second or third time.... I would then take that individual's file and review it with the superintendent, and he would either concur or deny the termination. Or he might recommend other action."). A fact-finder could also infer that the collective bargaining agreement was not strictly adhered to in Officer Lewis's case because his termination was based on a disciplinary citation that was itself untimely in violation of Article X. Whether official discretion was unconstitutionally abused in the context of Officer Lewis's dismissal, therefore, cannot be resolved as a matter of law.

In building an affirmative case that he suffered unconstitutional retaliation, Officer Lewis has presented only circumstantial evidence, but this evidence is sufficient

for his claim to survive summary judgment. At a general level, Officer Lewis has shown that at least some of the defendants knew of his cooperation and that such cooperation was, at best, controversial among some of his prison colleagues and superiors. *Cf.* Spigarelli Depo. at 82–83 (" 'Let me tell you what, Frank. I'm not proud of [the informants].' I said, 'Because if they had given me the information, you wouldn't be here right now.... I mean the time to stand up was then, not now.' "). More specifically, Officer Lewis has shown that Deputy Warden Green's report concerning the dispute with Officer Peck substantially relied on input from Lieutenant Kulp. *See* Spigarelli Depo. Ex. 5 ("[Deputy Warden Green] asked Lt. Kulp to review C.O. Lewis's report and respond in writing to [him]."). And a fact-finder could reasonably infer that Lieutenant Kulp had a strong interest in retaliation against Officer Lewis, since Officer Lewis had previously warned Lieutenant Kulp that, if asked, Officer Lewis would disclose that the Lieutenant had condoned inmate abuse. Indeed, as a result of the FBI's investigation, Lieutenant Kulp was ultimately sentenced to forty-one months for violating an inmate's federal civil rights. The further fact that, contrary to prison practice, Deputy Warden Green's investigation did not cause either Officer Lewis or Officer Peck to be interviewed could lead a fact-finder to doubt defendants' general assertion that Officer Lewis's case was handled according to ordinary, well-established procedures.

With respect to Officer Lewis's dismissal, a fact-finder might rely upon (a) the arbitrator's decision that Officer Lewis was terminated without cause in reliance on a procedurally improper citation, and (b) the temporal proximity of Officer Lewis's termination and his grand jury preparation, to conclude that defendants' alleged adherence to prison procedure in this case is open to doubts. And such doubts, combined with other circumstantial evidence, would adequately support a fact-finder's conclusion that retaliation was a substantial motivating force both in Officer Lewis's disciplinary citation and in his dismissal.

(3) The third step in determining First Amendment liability under *Green* is to decide whether the same adverse employment action would have been taken in the absence of the protected conduct. Defendants have only contested this point, however, in the context of their arguments, discussed above, concerning the progressive disciplinary scheme. Insofar as such arguments could not defeat Officer Lewis's claim of retaliatory motivation, they are also unsuccessful here; the question of whether Officer Lewis would have received equivalent discipline in the absence of his helping the FBI presents factual questions that cannot be resolved as a matter of summary judgment.

### 2. Pennsylvania Whistleblower Statute

■ Analysis of Officer Lewis's state law retaliation claim yields a similar result. Pennsylvania's Whistleblower Statute provides:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee [of a public body] regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee ... makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority of an instance of wrongdoing or waste.

43 Pa.Stat. § 1423. The statute also prohibits undertaking the above employment actions "because the employee is requested by an appropriate authority to participate in an investigation, hearing or inquiry held by an appropriate authority or in a court action." *Id.*

Defendants argue that Officer Lewis has not shown that he was dismissed because of his assistance to the FBI. They further assert that, under the § 1423's doctrinal system of burden shifting, *see, e.g., Watson v. City of Philadelphia,* 162 Pa.Cmwlth.

340, 638 A.2d 489, 492 (1994), summary judgment should be granted because Officer Lewis cannot show that defendants' proffered justification for punishing him—the progressive discipline system—is pretextual. Both of these arguments, however, fail for the reasons discussed in the previous subsection. If a reasonable factfinder decided to credit Officer Lewis's account of his dismissal rather than defendants', the circumstantial evidence in this case would show that (i) the disciplinary citation against him was not required by the collective bargaining agreement, and (ii) the disciplinary system was only a pretext for his retaliatory dismissal, which was undertaken by officials with both a motive and an opportunity to punish "the FBI snitch." *See supra* II.A.1. Thus, whether Officer Lewis has stated a prima facie case, and whether defendants' non-retaliatory explanations are pretextual, both involve questions of fact sufficient to defeat the motion at bar.

■ Defendants also contend that Officer Lewis cannot recover under the Pennsylvania statute because the arbitrator has already awarded him back wages and full reinstatement with benefits and seniority. § 1425 of the whistleblower statute, however, also allows plaintiffs to recover for actual damages, and Officer Lewis testified that he has suffered physical and emotional damage from his being sanctioned and fired. *See* Lewis Depo. at 114, 117 (claiming that his high blood pressure and hy-

pertension increased in connection with his termination as a result of the investigation); Lewis Depo. at 122, 135 (claiming emotional anguish from the prison officials' undermining his credibility). The extent of Officer Lewis's "actual damages" under § 1423 obviously depends on several disputed questions of fact, but the existence of such damages cannot be denied as a matter of law.

## B. Racial Discrimination

■ Officer Lewis has also asserted that defendants committed racial discrimination, in violation of 42 U.S.C. § 1981[3] and § 1985,[4] by deciding to sanction and dismiss him, while not imposing any comparable punishment on Officer Peck. Defendants dispute Officer Lewis's racial discrimination claims using arguments that mirror those lodged against his retaliation claims: First, defendants argue that Officer Lewis has not stated a prima facie case of racial discrimination because he has not proved that he was persecuted based on his race. Second, defendants claim that, under the burden shifting framework, Officer Lewis has not shown that the non-discriminatory justification for his dismissal was pretextual. Both of these arguments fail because they rest on the disputed factual contention that Officer Lewis was dismissed in strict, impartial compliance with Delaware Prison's progressive disciplinary system.[5]

3. The text of § 1981 reads:

   (a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens....
   (b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

4. § 1985(3) provides:

   If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any

person or class of persons of the equal protection of the laws ... whereby another is injured in his person or his property, ... the party so injured shall have an action for the recovery of damages occasioned by such injury ... against one or more of the conspirators.

5. Defendants also rely on their letter briefs to the Pennsylvania Human Relations Commission concerning two alleged incidents of racial discrimination in November of 1993, Exhibit E, and concerning the arbitration of Officer Lewis's dismissal, Exhibit F. These documents are not directly helpful to defendants' present motion, however, because neither one analyzes the evidence in the light most favorable to the plaintiff, per the re-

In fact, Officer Lewis has stated a prima facie claim of disparate treatment, insofar as he has presented evidence that he was sanctioned while a white officer who was at least equally (and assertedly much more) culpable was not. And, as discussed above, the progressive disciplinary policy did not speak conclusively on the practice of issuing citations. *See* supra II.A..1. As to the subsequent decision to dismiss, Officer Lewis's arguments are less strong, but they are still sufficient to raise a disputed question of material fact. Defendants contend that the record contains no evidence of racial animus. However, the circumstantial evidence of prison officials' acquiescence in previous acts of racial discrimination, combined with the procedural anomalies that occurred in Officer Lewis's particular case, could lead a reasonable fact-finder to find that racial animus did substantially motivate Officer Lewis's dismissal.

■ With respect to Officer Lewis's § 1985 claim, defendant contends that Officer Lewis has not shown any evidence of a conspiracy. However, the evidence presented is sufficient to support the inference that several prison officials were involved in Officer Lewis's being disciplined. If, as Officer Lewis asserts, his being sanctioned and fired was indeed caused by racial animus, a fact-finder could reasonably infer that two or more of these officials acted in concert. The next section of this opinion will consider which of the individual defendants should be deemed liable, for purposes of summary judgment, as alleged participants in this conspiracy.

C. Intentional Infliction of Emotional Distress

■ With respect to this state law claim, Officer Lewis does not dispute de-

fendants' argument that Pennsylvania law requires expert medical evidence of harm. *See Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A.2d 988, 995 (1987). In this case, Officer Lewis has not presented such medical evidence, and he also has not shown conduct of such outrageousness and extremity as has typically been required to support a suit alleging intentional infliction of emotional distress. Thus, summary judgment will be granted on this claim with respect to all defendants.

### III. Scope of Liability

Because Officer Lewis has presented sufficient evidence of (a) retaliation, illegal both under federal law and under Pennsylvania law, and (b) racial discrimination, illegal under federal law, sufficient to permit a fact-finder to find liability, it remains to be determined who might be held liable. Officer Lewis has sued three sets of defendants: (i) non-prison officials, including county council members and Board inspectors; (ii) prison officials, including Warden Hill, Assistant Warden Spigarelli, Assistant Warden DeAntoniis, Deputy Warden Green, and Lieutenant Kulp; and (iii) governmental entities, including Delaware County, Delaware Prison, and the Delaware Prison Board of Inspectors. And, based on the arguments before us, two questions arise for each of these sets.[6] First, we must decide whether such defendants could properly be found liable for violating plaintiff's federal civil rights, and second, we must decide whether they could properly be found liable under the Pennsylvania Whistleblower Statute.

A. Non–Prison Officials

■ With respect to Officer Lewis's civil rights claims, the parties apparently do not

quirements of Federal Rule of Civil Procedure 56. *See, e.g.,* Exhibit F at 14 ("There were a number of disputed facts.... It is the Employer's position that credibility should be resolved in its favor."). Defendants do not explain how any particular part of their "mountain of documentary evidence," Defs. Mot.Summ.J. at 27—which was constructed

for use in highly distinguishable legal contexts—bears on any party's argument as to the motion at bar.

**6.** This caveat is made necessary because the parties have declined to address potential distinctions among and interrelationships between Officer Lewis's civil rights claims.

dispute that liability can only be imposed on individuals who are personally involved in the allegedly illegal actions. *See Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior."). As a preliminary matter, however, Officer Lewis has presented no evidence that any county council member or Board inspector was aware of the events surrounding Officer Lewis's citation and dismissal. Instead, he attempts to prove such knowledge indirectly: Officer Lewis has submitted a letter that identifies him as a witness in a lawsuit brought by the inmate whose beating Officer·Lewis witnessed on May 28, 1994. He urges this court to take judicial notice of the year in which this lawsuit was filed, as inferred from the civil docket number, and of the requirement that civil plaintiffs disclose a list of individuals likely to have discoverable information. Even if these two facts could be judicially noticed, however, there is no apparent basis to infer therefrom that any county council member or prison board inspector received such disclosures. Nor is there a basis to conclude that, had they done so, such disclosures would have provided these individual defendants with any information that would be relevant to the rights violations alleged in this case.

Moreover, there is no evidence that any of the non-prison officials played a personal role in the decisions that caused Officer Lewis to be disciplined and removed. In his memorandum, Officer Lewis suggests that the "evidence of record" shows that Delaware County and the Board of Prison Inspectors officially adopted the collective bargaining agreement pursuant to which defendants allege that they dismissed Officer Lewis. Officer Lewis does not link this adoption to any individual official, however; and even if he had, the act of adopting a collective bargaining agreement is not proof that any of the individual adopters were personally involved in particular misapplications of that agreement for retaliatory or discriminatory purposes.

Similarly, with respect to Officer Lewis's state law claim, there is no evidence to show that any county council member or prison board inspector "discharge[d], threaten[ed] or otherwise discriminate[d] or retaliate[d]" against Officer Lewis for purposes of § 1423. Without evidence that these individuals (1) knew of Officer Lewis's cooperation with the FBI and (2) participated in the alleged employment actions that were taken against him, such individuals cannot, as a matter of law, be liable under the federal civil rights statutes or under 43 Pa.Stat. § 1423.

**B. Prison Officials**

■ Turning to Officer Lewis's claims against his superiors at Delaware Prison, plaintiff has provided sufficient circumstantial evidence from which a fact-finder could reasonably infer that Lieutenant Kulp, Deputy Warden Green, Assistant Warden DeAntoniis, Assistant Warden Spigarelli, and Warden Hill were personally responsible for the allegedly illegal decisions to sanction and dismiss Officer Lewis. Assistant Warden Spigarelli appears to have initiated the investigation and the final decision to sanction Officer Lewis in connection with his altercation with Officer Peck. *See* Spigarelli Depo. at Ex. 4. Deputy Warden Green conducted the investigation that supported the decision to sanction, and, in doing so, he relied significantly on a written report from Lieutenant Kulp that responded to Officer Lewis's account of the incident. *See* Spigarelli Depo. at Ex. 5. Assistant Warden DeAntoniis, Assistant Warden Spigarelli, and Warden Hill, in turn, all appear to have been directly responsible for the decision to terminate Officer Lewis, with Warden Hill having final authority to make that decision. If Officer Lewis is correct that prison officials' decisions to sanction and to dismiss him were corrupted by retaliatory or discriminatory motivation, the sources of that motivation and

the active participants in giving it operative force could include any or all of these individual defendants. Thus, summary judgment should be denied with respect to Officer Lewis's claims against these defendants under 42 U.S.C. §§ 1981 and 1983 as well as under 43 Pa.Stat. § 1423. Furthermore, because there appears to have been significant cooperation between these defendants—as arguably manifested by overt acts that include meetings and reports—the evidence is sufficient to find them liable for conspiracy under § 1985 as well.

## C. Governmental Entities

■■■ In addition to the individual defendants discussed above, Officer Lewis alleges liability against Delaware County, Delaware Prison, and the Board. Both litigants apparently agree that municipal liability under the federal civil rights acts can only be found in this case if some municipal official with "final policy making authority" has acted illegally, such that the municipality may itself be deemed to have acted wrongfully. *See, e.g., Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). In this case, the relevant municipal official is Warden Hill, and defendants have not contested that Warden Hill possesses sufficient "final policy making authority" to attribute his actions, as a matter of law, to Delaware County and to Delaware Prison. Insofar as Warden Hill is responsible for making final personnel decisions and for implementing prison disciplinary procedures— which responsibilities may plausibly have been delegated to him by Delaware Prison and/or Delaware County—summary judgment cannot be granted in favor of either of these governmental entities.

■■■ With respect to the Prison Board of Inspectors, the parties disagree about the level at which the Board is responsible for the operation of Delaware Prison and, therefore, the concomitant degree to which Warden Hill's actions may be construed as those of the Board itself. Evidence presented by the defendants shows that the Board only gathered information from monthly meetings with prison officials for purposes of reporting controversies or illegalities to the county council or the press, but that its duties did not encompass any appreciable "policy making authority" regarding the prison's operation. *See, e.g.,* Hill Depo. at 10–11. Thus, it seems that decisions taken by Warden Hill, in his capacity as a final policy maker, should not be attributed to the Board.

On the other hand, Officer Lewis testified that "the board has responsibility of [sic] everything that goes on with the prison," and that they "should know everything that goes on in that prison, everything." Lewis Depo. at 79–80 ("Mr. DeAntoniis and Mr. Spigarelli and Mr. Hill ... were [the board's] employees, they oversee those employees. Their employees, in turn oversee everything that goes on in the prison.... Am I blaming them as a body, yes, because they should know everything."). In context, however, this testimony does not seem to express Officer Lewis's impression regarding the *actual* degree of Board oversight with respect to prison activities. For example, Officer Lewis has not specified any time, other than the above-mentioned monthly meetings, during which Board members exercised any "final policy making authority" over prison operations. Thus, no material question of fact has been raised regarding the Board's responsibility for the alleged misconduct against Officer Lewis, and the Board will be granted summary judgment with respect to each of Officer Lewis's civil rights claims.

■■■ With respect to Officer Lewis's state law claim, the dispositive question is whether any of the governmental defendants were Officer Lewis's "employer" for purposes of § 1423. The text of the statute defines employer as "[a] person supervising one or more employees, including the employee in question; a superior of that supervisor; or an agent of a public body." 43 Pa.Stat. § 1422. In this case, a

fact-finder could reasonably infer that Delaware County, Delaware Prison, and the Delaware Prison Board of Inspectors were superiors of Officer Lewis's ultimate supervisor, Warden Hill. Thus, summary judgment as to the Pennsylvania Whistleblower Statute must be denied with respect to all three governmental entities. An appropriate order is attached.